**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 01-11026

_____

APANI SOUTHWEST, INC.,

Plaintiff-Appellant,

versus

COCA-COLA ENTERPRISES, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

August 12, 2002

Before STEWART and CLEMENT, Circuit Judges.[1]

CARL E. STEWART, Circuit Judge:

Plaintiff-Appellant, Apani Southwestern, Inc. ("Apani"), appeals from the district court's

dismissal of its antitrust claims against Coca-Cola Enterprises, Inc. ("CCE") arising out of a contract

between CCE and the city of Lubbock, Texas (the "City"), which granted CCE the exclusive right

to sell bottled water on property owned by the City. For the reasons stated herein, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

---

[1]Judge Politz was a member of the panel that heard oral arguments. However, due to his
death on May 25, 2002, he did not participate in this decision. This case is being decided by a
quorum pursuant to 28 U.S.C. § 46(d) (1996).

Apani is a manufacturer of purified bottled water operating in and around the Lubbock, Texas area. Prior to the events in question, Apani had developed a business relationship with the City, which permitted Apani to sell its product in facilities owned and operated by the City. On August 26, 1999, however, the City entered into an exclusive contractual agreement with CCE allowing CCE to supply non-alcoholic beverages to all facilities "owned and operated" by the City and precluding the City from purchasing beverages from other parties.[2] The agreement, therefore, effectively eliminated the City's business relationship with Apani.[3] The contract between the City and CCE arose from a proposal by the City that CCE donate approximately one million dollars for the construction of two new scoreboards at the Lubbock Municipal Coliseum. CCE agreed to provide the funds for the scoreboards as long as it would be permitted to recoup some of its investment. Accordingly, a contract was drafted giving CCE "the exclusive right to advertise and promote Exclusive Beverages in and with respect to the Terri tory(s), the Locations and Sites, and with respect to the CITY of LUBBOCK, events at the Locations. . . ." The agreement, however, provided for several exceptions, including the following:

> (1) the right of the city to make available fresh-squeezed juice, tea, coffee products, water drawn from the public water supply, and milk products as long as CCE does not distribute a similar product;
>
> (2) permit trade show exhibitors who have an exclusive agreement for competitive products to advertise, display, serve, or sample products during trade show events;
>
> (3) allow customers with a single beverage serving for immediate consumption to drink but not refill them;

---

[2]In its complaint, Apani stated that the property "owned and operated" by the City consisted of twenty-seven facilities.

[3]This contract provided for a ten-year term and the automatic right to renew for an additional five years.

2

(4) *permit local water bottling (Apani) company, that is the official sponsor of the Cotton Kings, to sell bottled water at professional hockey games. This water will not be chilled or iced down*; and

(5) allow amateur sports leagues in city parks the option to sell concessions using competing products.

Apani filed suit against CCE seeking damages for violations of § 3 of the Clayton Act, 15 U.S.C. § 14, and the Texas Free Enterprise and Antitrust Act ("TFEAA"), TEX. BUS. & COM. CODE ANN. § 15.01 et seq. It also alleged claims of tortious interference with existing and prospective business relations. CCE filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted CCE's motion as to the state and federal antitrust claims, but denied the motion with regard to the tortious interference claims. Subsequent to the partial dismissal, the court allowed Apani to file a Second Amended Complaint adding causes of action under the Sherman Act, 15 U.S.C. §§ 1 and 15, and a civil conspiracy claim. The district court again dismissed all of the antitrust claims pursuant to Rule 12(b)(6). CCE then filed a Motion for Summary Judgment as to the tortious interference and civil conspiracy claims. The district court granted the motion as to both claims. Thereafter, Apani filed a motion to Alter or Amend Summary Judgment, which the district court denied.

STANDARD OF REVIEW

We review a district court's ruling on a Federal Rule of Civil Procedure 12(b)(6) motion *de novo*. Jackson v. City of Beaumont Police Dep't, 958 F.2d 616, 618 (5th Cir. 1992). In reviewing the dismissal of a claim pursuant to 12(b)(6), this court must accept all of the plaintiff's factual allegations as true. Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995). "The motion may be granted only if it appears that no relief could be granted under any set of facts that could be

3

proven consistent with the allegations." Jackson, 958 F.2d at 618 (quotation marks and citations omitted). "[D]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." Blackburn, 42 F.3d at 931 (citation omitted).

A district court's grant of summary judgment is also reviewed *de novo*. Melton v. Teachers Ins. & Annuity Ass'n of Am., 114 F.3d 557, 559 (5th Cir. 1997). Summary judgment is proper where the pleadings and summary judgment evidence present no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A factual dispute will preclude an award of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## DISCUSSION

Apani asserts antitrust violations against CCE under the Clayton Act, the Sherman Act, and the TFEAA. Specifically, in its Second Amended Complaint, Apani asserted that "[t]he Agreement, having a duration of ten (10) years, represents a contractual agreement resulting from an illegal combination or conspiracy by the City of Lubbock and Coca-Cola, and which constitutes a restraint of trade in violation of the Sherman Antitrust Act, the Clayton Antitrust Act, and the Texas Free Enterprise and Antitrust Act of 1983."

I.      Clayton Act

Section 3 of the Clayton Act makes it unlawful to sell goods on the "condition, agreement, or understanding" that the purchaser refrain from dealing with competitors of the seller if the effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14 (1997). Two types of restrictions on competition may be challenged under § 3: tying

4

restraints and exclusive-dealing arrangements. Gulf Oil Corp. v. Copp Paving Co., Inc., 419 U.S. 186, 194 (1974). Tying restraints occur when a seller agrees to sell one product on the condition that the buyer also agree to purchases a different, or tied product, or the buyer agrees that he will not purchase the same product from another supplier. Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1048 n.5 (5th Cir. 1982). Exclusive dealing, in contrast, occurs when a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller. WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK § 4.02[3] (1999). Here, Apani's claim under § 3 arises from the exclusive arrangement between the City and CCE in which the City agreed to permit CCE to sell its products exclusively on property owned and operated by the City. This court has recognized that an exclusive-dealing arrangement does not violate § 3 of the Clayton Act unless the probable effect of the agreement "will foreclose competition in a substantial share of the line of commerce affected." Bob Maxfield, Inc. v. Am. Motors Corp., 637 F.2d 1033, 1036 (5th Cir. 1981) (citing Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)).

When assessing whether an exclusive-dealing arrangement has the probable effect of substantially lessening competition, the Supreme Court has identified a three-part inquiry. Tampa Elec. Co., 365 U.S. at 327-28. First, the relevant product market must be identified by considering interchangeability and cross-elasticity of demand. Second, the relevant geographic market must be identified, "by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies." Id. Finally, a plaintiff must show that the "competition foreclosed by the arrangement constitutes a 'substantial share of the relevant market.' " Id. That is, "the opportunities for other traders to enter into or remain in that market must be significantly

5

limited." Id.

In applying this three-step analysis, it is clear that in order to determine whether a substantial portion of the competition has been foreclosed, Apani must first identify the relevant product and geographic markets.

A.     Product Market

In ascertaining the relevant product market, courts consider the extent to which the seller's product is "interchangeable in use" and the degree of "cross-elasticity of demand between the product itself and substitutes for it." C.E. Servs., Inc. v. Control Data Corp., 759 F.2d 1241, 1245 (5th Cir. 1985) (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  Within the product market, there may exist submarkets which, in themselves, represent product markets for antitrust purposes.  Heatransfer Corp. v. Volkswagenwerk, A. G., 553 F.2d 964, 980 (5th Cir. 1977) (citing United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 593-595 (1957)). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Heatransfer Corp., 553 F.2d at 980 (quoting Brown Shoe Co., 370 U.S. at 325).  The district court properly determined, and neither of the parties contest, that the relevant product market is bottled water.

B.     Geographic Market

We focus on the area of "effective competition" in determining the relevant geographic market. Jim Walter Corp. v. F. T. C., 625 F.2d 676, 682 (5th Cir. 1980).  The area of effective competition in the known line of commerce must be charted by careful selection of the market area

6

in which the seller operates and to which buyers can practicably turn for supplies. Tampa Elec. Co., 365 U.S. at 327. The geo graphic market must " 'correspond to the commercial realities' of the industry and 'be economically significant.'" Brown Shoe Co., 370 U.S. at 336-337. "Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." Id. (citation omitted).[4]

When determining whether a geographic market corresponds to commercial realities, courts have taken into account practical considerations such as the size, cumbersomeness, and other characteristics of the relevant product. In addition, determinants that affect the behavior of market participants may also be considered such as regulatory constraints impeding the free flow of competing goods into the area, perishability of products, and transportation barriers. EARL W. KINTNER, FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.3 (1984); United States v. Conn. Nat'l Bank, 418 U.S. 656, 669-671 (1974); United States v. Gen. Dynamics Corp., 341 F. Supp. 534 (N. D. Ill. 1972).

On the other hand, the economic significance of a geographic area "does not depend upon singular elements such as population, income, political boundaries, or geographic extent, but rather upon the relationship between these elements and the characteristics of competition in the relevant product market within a particular area." EARL W. KINTNER, FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.2 (1984). Put differently, in order for an area to qualify as being economically significant, it must contain an

---

[4]Although Brown Shoe Co. involved a violation of § 7 of the Clayton Act, the tests for determining a geographic market under §§ 3 and 7 of the Act are similar. Brown Shoe Co., 370 U.S. at 329; United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 366 (1963). Thus, cases determining a geographic area under § 7 are equally applicable to cases brought under § 3. Brown Shoe Co., 370 U.S. at 329- 330.

"appreciable segment of the product market." Id. "Whether a segment is 'appreciable' depends upon whether it includes either an appreciable proportion of the product market as a whole, or a proportion of the product market which is 'largely segregated from, independent of, or not affected by' competition elsewhere." Id. Therefore, it is not required that an area encompass a large percentage of all business activity in the relevant product market to be considered economically significant. An area containing only a small percentage of business activity may qualify as being economically significant if the relevant competition in that specific area is insulated from equivalent competition elsewhere.

C.     Foreclosure of Competition

After the relevant market has been identified, it must then be determined whether the arrangement foreclosed competition in a substantial share of the established market. Tampa Elec. Co., 365 U.S. at 327-38.

II.     Sherman Act

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1 (1997). In order to demonstrate a claim of unreasonable restraint of trade under Section 1, Apani must establish that: (1) the City and CCE engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market. Spectators' Comm. Network Inc. v. Colonial Country Club, 253 F.3d 215, 220 (5th Cir. 2001); Johnson v. Hosp. Corp. of Am., 95 F.3d 383, 392 (5th Cir. 1996). Apani, as the plaintiff, has the burden of proving all the elements of a Section 1 violation. Id. (citing Jefferson Parish Hosp. Dist. No. 2, v. Hyde, 466 U.S. 2, 29 (1984)).

8

As an initial matter, Apani does not contend on appeal that CCE's actions were *per se* illegal. Thus, the rule of reason analysis is applicable to Apani's claim. Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc., 123 F.3d 301, 307 (5th Cir. 1997). Under this rule, Apani must demonstrate that the "complained-of actions unreasonably restrained trade." Id. The court must then balance the "anticompetitive evils of a restrictive practice . . . against any procompetitive benefits or justifications within the confines of the relevant market. Proof that the defendant's activities, on balance, adversely affected competition in the appropriate *product and geographic markets* is essential to recovery under the rule of reason." Id. (citing Hornsby Oil Co. v. Champion Spark Plug Co., 714 F.2d 1384, 1392 (5th Cir.1983)) (emphasis added). Thus, as under the Clayton Act, the first step in analyzing a Section 1 claim is defining the relevant product and geographic markets. The same test applied for determining the relevant product and geographic markets for Clayton Act claims is also used for alleged violations of the Sherman Act. Bob Maxfield, Inc., 637 F.2d at 1036.

III.    Texas Free Enterprise and Antitrust Act

The TFEAA was enacted to establish antitrust laws for the State of Texas. TEX. BUS. & COMM. CODE § 15.01 et seq. (Vernon 1987). Each provision of the Act is modeled after a corresponding provision of federal antitrust law. Roy B. Taylor Sales, Inc. v. Hollymatic Corp., 28 F.3d 1379, 1388 (5th Cir. 1994); Caller-Times Pub. Co., Inc. v. Triad Communications, Inc., 826 S.W.2d 576, 580 (Tex. 1992). As such, Texas courts are statutorily instructed to interpret the TFEAA in harmony with federal judicial interpretations of equivalent federal laws. TEX. BUS. & COMM. CODE § 15.04; Caller-Times Pub. Co., Inc., 826 S.W.2d at 580. Accordingly, Texas courts have adopted federal standards for determining violations of the TFEAA, including the use of a relevant market to determine whether substantial reductions in competition have occurred. Roy B.

9

Taylor Sales, Inc., 28 F.3d at 1388; Caller-Times Pub. Co., Inc., 826 S.W.2d at 580.

IV.     Dismissal of Antitrust Claims

The district court dismissed all of Apani's antitrust claims, finding Apani's geographic market definition legally insufficient as a matter of law. Whether a relevant market has been identified is usually a question of fact; however, in some circumstances, the issue may be determined as a matter of law. Seidenstein v. Nat'l Med. Enters., Inc., 769 F.2d 1100, 1106 (5th Cir. 1985). Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted. See, e.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997) (affirming the district court's dismissal of an antitrust claim for failure to plead a relevant market because the definition of the proposed market was too narrow); TV Comms. Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992) (upholding the district court's dismissal of a claim for failure to plead a relevant market where the alleged market consisted of only one specific television channel). Because a relevant geographic market must be identified for Apani's claims under the Clayton Act, the Sherman Act, and the TFEAA, this court's analysis of the relevant market shall be equally applicable to all of Apani's antitrust claims.

As stated previously, the alleged geographic market must correspond to the commercial realities of the industry and be economically significant. Brown Shoe Co., 370 U.S. at 336-337. After giving careful consideration to each of the factors identified for determining whether a geographic area corresponds to the commercial realities of the industry, the district court concluded that the

10

relevant geographic market could not consist of only the twenty-seven facilities owned by the City as Apani suggests. The court pointed out that Apani had done business in and throughout Lubbock, Texas with customers other than the City, such as Texas Tech University. Thus, it concluded that there were no limitations on Apani's geographic sales market by the size, cumbersomeness, or perishability of its bottled water that would warrant restricting the geographic market to the City facilities covered by the exclusive agreement. The court further noted that there were no regulatory requirements, or inherent shipping limitations affecting Apani's product distribution that would support confining the geographic market of competition to the twenty-seven City-owned facilities. Thus, the court found that Apani's relevant geographic market definition did not comport with the commercial realities of the industry. It stated that, at the very least, the commercial realities of the industry suggest that the relevant geographic market must include the entire city of Lubbock.

The district court next considered whether the restraint on the alleged geographic market was economically significant. When assessing economic significance, a court must determine whether the geographic area contains an appreciable segment of the product market. EARL W. KINTNER, FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.2 (1984). As discussed supra, "whether a segment is appreciable depends on whether the segment includes either an appreciable proportion of the product market as a whole, or a proportion of the product market largely segregated from, independent of, or not affected by, competition elsewhere." Id. The district court found that "[n]o unique limitation on competition would suggest that competition for the City of Lubbock bottled water business is separate from competition for bottled water business elsewhere in the Lubbock, Texas bottled water market." Because Apani failed to allege that an appreciable proportion of the sale of bottled water

11

in the Lubbock area was affected by the agreement, the court determined that Apani's geographic market definition also failed to meet the economic significance test. Thus, the court concluded that "[t]here is no set of facts under which Apani can recover; either the relevant geographic market is too small to meet the requirements set forth by the Supreme Court, or the injury to competition is not sufficiently significant to be a violation of the Act."

In the alternative, the court determined that Apani's geographic market definition was inadequate because t he City is a "single purchaser," and "one purchaser in a market of competing purchasers cannot constitute a relevant geographic market, absent exceptional market conditions." See Jayco Sys., Inc. v. Savin Bus. Mach. Corp., 777 F.2d 306, 319 n.43 (5th Cir. 1985). In Jayco, the plaintiff, a distributor for a major copier manufacturer, alleged that the defendant attempted to monopolize the copier business of one customer, the State of Texas. The plaintiff defined the relevant market as "low and medium volume copiers" for the State of Texas copier business. Id. at 319. We explained that "as a matter of common sense a single purchaser of a product cannot general ly be considered a relevant market, lest we wish to clothe each and every sale with an antitrust suit." Id. at 320. However, this court noted that "[w]e hazard the suggestion that a single purchaser could not be considered a relevant market unless plaintiff made some showing of the purchaser's monopsony power."[5] Id. at n. 46. The district court reasoned that Apani's asserted geographic market alleges a "single purchaser" within the meaning of Jayco and therefore, as a matter of law, it failed to properly define a relevant geographic market upon which relief may be granted.

In addition, the district court found that Apani's argument was deficient because it , in effect,

---

[5]Monopsony refers to price fixing or monopolization by a single buyer. In re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir.1979).

suggested that a seller or owner of property to which potential buyers come, may not decide what products it will sell or permit to be sold on the property. In support of this proposition, the court relied on the Seventh Circuit's opinion in Elliott v. United Ctr., 126 F.3d 1003 (7th Cir. 1997). In Elliott, a licensed peanut vendor, who formerly sold peanuts outside the United Center, an entertainment complex, sued the United Center on the grounds that its policy of prohibiting patrons from bringing food into the complex violated the Sherman Act. The vendor alleged that the "market for food concessions within and around the United Center itself" constituted a relevant market for antitrust purposes. Id. at 1005. The district court dismissed the claim finding that the vendor failed to adequately identify a relevant geographic market. In affirming the district court's ruling, the Seventh Circuit stated that

> The logic of Elliott's argument would mean that exclusive restaurants could no longer require customers to purchase their wines only at the establishment, because the restaurant would be "monopolizing" the sale of wine within its interior. Movie theaters, which traditionally (and notoriously) earn a substantial portion of their revenue from the sales of candies, popcorn, and soda, would be required by the antitrust laws to allow patrons to bring their own food.

Id.

In the instant case, the district court stated that Apani's argument, like the one presented in Elliott, would deny property owners the right to determine for themselves what products they will sell on their property. It reasoned that the antitrust laws are not designed to preclude businesses from selling what they choose on their property, rather the laws are intended to prevent persons from manipulating the marketplace in restraint of trade. The court concluded that Apani's claims fell outside the realm of injuries for which the antitrust laws were enacted to protect, and therefore Apani failed to state a claim upon which relief could be granted.

13

Apani asserts several points of error in connection with the district court's conclusion that it failed to sufficiently allege a relevant geographic market. First, Apani challenges the district court's determination that the "territory(s)" and "locations" owned by the City within the meaning of the exclusive dealing agreement are too narrow from a geographic standpoint to constitute a relevant market. It argues that the district court erroneously designated the relevant property as that "owned" by the City, which consists of twenty-seven locations, rather than that "owned *or* operated" by the City, as alleged in Apani's complaint, or "owned *and* operated" by the City, as provided in the exclusive agreement. Apani explains that, had the district court considered all the property owned and/or operated by the City, the effect would have been an expansion of the alleged geographic area.

Next, Apani concedes that identifying a relevant market requires more than a determination of "metes and bounds,"[6] however, it argues that there is no existing case law that places such a restrictive view in a Rule 12(b)(6) context. It suggests that in construing the pleading requirement for a relevant geographic market, we look to the Seventh Circuit's decision in MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 62 F.3d 967 (7th Cir. 1995). In MCM Partners, Inc., MCM, a rental equipment company, brought an antitrust suit against exhibition contractors alleging that the contractors violated Section 1 of the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act, when they refused to rent forklifts and other material handling and personnel moving equipment from MCM. The district court dismissed MCM's antitrust claim with prejudice, finding that it failed to state a claim for which relief could be granted under Section 1 because it had not sufficiently alleged a contract, combination, or conspiracy in restraint of trade. In the alternative, the court determined that MCM failed to plead facts supporting its definition of the relevant

---

[6]Tampa Elec. Co., 365 U.S. at 331-32.

14

geographic market.

In its complaint, MCM defined the relevant market as "the rental of forklifts, material handling and personal moving equipment to the convention and trade show industry in Chicago, Illinois." Id. at 975. It alleged t hat the "vast majority" of Chicago's convention and trade show activities take place at Chicago's McCormick Place Complex and that the consumers in that market consisted of "exhibition contractors who set up, install, and disassemble the booths and other physical items" used in the industry. Id. The district court stated that these allegations defined the relevant market too narrowly because MCM failed to include in its complaint facts demonstrating that the market for MCM's equipment was limited to exhibition contractors. In overturning the district court's ruling the Seventh Circuit held that

> The district court's willingness to look behind MCM's allegations because it believed MCM had not alleged facts to support the complaint's market definition is in considerable tension with our recent decision in Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 778, 782 (7th Cir.1994). There, we explained that judicial attempts to apply *a heightened pleading standard* in antitrust cases had been "scotched" by the Supreme Court's decision in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993), and that after Leatherman, an antitrust plaintiff need not include "the particulars of his claim" to survive a motion to dismiss. 33 F.3d at 782. It is instead sufficient for the plaintiff to include in its complaint only "a short and plain statement of the claim" showing an entitlement to relief. FED .R. CIV. P. 8(a)(2); see Leatherman, 507 U.S. at ----, 113 S.Ct. at 1163; Hammes, 33 F.3d at 778. . . . [I]t is not inconceivable to us that MCM could prove a set of facts supporting the relevant market definition alleged in its complaint. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957). It was therefore erroneous for the district court . . . to dismiss MCM's section 1 claim on this ground.

Id. at 976-77 (emphasis added).

Apani asserts that an application of the standard set out in MCM Partners, Inc., to the present case would compel a reversal of the district court's ruling. It directs our attention to the fact that the Seventh Circuit specifically determined that it is not inconceivable that MCM could prove a set of

15

facts supporting the relevant market definition alleged in its complaint. Apani argues that its complaint indicated a more defined geographic area than that in <u>MCM Partners, Inc.</u> and involved absolute preclusion of competition as opposed t o mere restraint. Thus, Apani submits that its allegations of a relevant market fully comply with Federal Rule of Civil Procedure 8(a)(2)'s "short and plain statement" requirement. However, Apani claims that in dismissing its complaint, the district court erroneously applied a heightened pleading standard to its antitrust claims, rather than that set forth in Rule 8(a)(2). It argues that such an application is inconsistent with the Supreme Court's admonishment in <u>Leatherman</u>.

Lastly, Apani argues that the district court erroneously applied this court's reasoning in <u>Jayco</u> to the instant case. Specifically, Apani maintains that with regard to the relevant geographic market, the pertinent inquiry is not whether there is a "single purchaser," rather the court should consider the geographic area, and degree of market activity controlled by the City, which has been foreclosed by the agreement. It claims that by foreclosing competition in all public facilities owned, or controlled by the City, the agreement had the effect of totally eliminating competition in those venues in which there are mass gatherings of people, including conventions, trade shows, entertainment events, sports events, and other activities. Apani concludes that any reference to the City as a "single purchaser" mischaracterizes the offensive nature of the subject agreement, as the City may or may not be a purchaser of the product, but the City granted the "exclusive dealing arrangement," which dictates the beverage product offered to the captive persons in attendance at the defined properties, and forecloses any other competition at the public venues.

With respect to the district court's reliance on <u>Ellliot</u>, Apani argues that <u>Ellliot</u> can be distinguished from the present case. First, it points out that <u>Ellliot</u> presented claims of only antitrust

16

violations under the Sherman Act. Second, Apani asserts that the alleged antitrust violation in Elliott was not based on an anti-competitive agreement entered into between the owner of the facility and a beverage or food supplier, but rather involved a complaint that the arena policy prohibited sale of peanuts outside of the arena to its patrons, which could not then be brought into the arena. It claims that such a factual situation is distinguishable from the instant case in that the agreement between CCE and the City represents a definite written agreement to foreclose competition through an "exclusive dealing arrangement," relating to all beverages sold or distributed by CCE within a defined geographic market.

In addition, Apani argues that the district court has failed to take into consideration that a patron attending an event at a City-owned facility will not likely cross the street to purchase a beverage at a convenience store where competing products may be displayed. It states that the patron is compelled by physical and/or time limitations to purchase the products of the entity that has obtained the exclusive right to sell the product within the specific building or area. Apani further argues that, as a practical matter, the elements of interchangeability and cross-elasticity of demand are of little significance because any analysis that determines the "relevant geographic market" only on the basis of square footage or acreage, ignores the intended prohibitions of the antitrust statutes.

After reviewing the record on appeal, and considering Apani's arguments in light of the applicable law and standards, we conclude the district court correctly decided to dismiss the antitrust claims. With regard to Apani's criticism of the district court for purportedly misstating the scope of the alleged geographic market, we find that no error was committed. In its Second Amended Complaint, Apani alleged as the relevant market "all City of Lubbock owned or operated facilities, numbering approximately *twenty-seven (27) separate properties*." Apani now argues that the district

17

court erroneously referred to the twenty-seven locations owned by the City as the claimed relevant market. Specifically, it maintains that the district court only considered property "owned" by the City, rather than "owned or operated" by the City. This argument is without merit. Whether the property at issue is referred to as the property "owned" by the City, or the property "owned or operated" by the City, according to the facts stated in Apani's complaint, the subject property consists only of twenty-seven locations. Thus, the "owned or operated" issue raised by Apani is no more than an exercise in semantics and does not alter the correctness of the district court's decision to dismiss the antitrust claims.

We reject Apani's claim that the language of the exclusive agreement itself expands the relevant market beyond the geographic area identified by the district court. The operative language of the agreement defines the relevant property as that "owned *and* operated by CITY OF LUBBOCK, except City Hall and Lubbock International Airport." Apani claims that the number of properties covered by the agreement would have been "expanded" had the district court considered properties both "owned and operated" by the City. This argument makes little logical sense. Given the use of the conjunction "and," there can be no subset of properties that might fit within the "owned and operated" category but not within the "owned" category since every facility "owned and operated" by the City must also be "owned" by the City.

Having concluded that the district court properly identified the twenty-seven City-owned facilities as the alleged relevant geographic market, we must now consider whether the defined market is insufficient as a matter of law. As an initial matter, Apani is correct in its assertion that a heightened pleading standard may not be applied to antitrust claims, however, a less stringent standard of pleading does not relieve Apani from its obligation to allege facts sufficient to support

18

an antitrust violation. See Endsley v. City of Chicago, 230 F.3d 276, 382 (7th Cir. 2000) ("It is true that Leatherman v. Tarrant County, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), bars the district court from applying a heightened pleading standard in antitrust cases. . . . However, to survive a motion to dismiss, plaintiffs still must set forth facts sufficient to create an inference that defendant had enough market power to create a monopoly." (citation omitted)).

In insisting that the relevant geographic market requirement has been met, Apani relies heavily on MCM Partners, Inc. That reliance is sorely misplaced. In MCM Partners, Inc., the alleged geographical market, i.e. the convention and trade show industry, is obviously broader than the geographic market alleged by Apani, even though most of the convention and trade show activity took place at Chicago's McCormick Place. Here, Apani has simply attempted to artificially narrow a broader economic market, the City of Lubbock, to specific venues. Such pleading maneuvers may not be used for the purpose of creating a fictitious market. Thus, we find Apani's geographic market definition  insufficient as a matter of law.

Because we find that the district court's initial reason for dismissing Apani's claim, i.e. the alleged geographic market did not correspond to the commercial realities of the industry and was not economically significant, was proper, we do not reach the issue of whether the City is a "single purchaser" under the Jayco analysis.

V.     Tortious Interference

 Next, Apani argues that the district court erred in granting CCE summary judgment on its claims of tortious interference with both existing and prospective business relations.

A.      Tortious Interference with Existing Business Relations

The essential elements of a tortious interference with an existing business relationship cause

19

of action are (1) unlawful actions undertaken without justification or excuse; (2) with intent to harm; and (3) actual damages. Morris v. Jordan Fin. Corp., 564 S.W.2d 180, 184 (Tex. App. 1978). In proving this claim, the plaintiff does not need to prove the existence of a valid contract, but only that the defendant's interference is motivated by malice. CF & I Steel Corp. v. Pete Sublett & Co., 623 S.W.2d 709, 715 (Tex. App. 1981). The district court dismissed Apani's claim because it concluded that Apani had failed to demonstrate the first element of the claim–an unlawful act. Apani argues that it produced credible evidence that the existing business relationship between Apani and the City would have continued had CCE not entered into a contract with the City, effectively eliminating the City's business relationship with Apani. Thus, it concludes that CCE was not entitled to summary judgment on this issue. In its brief, Apani does not point to any unlawful act supporting its claim. However, in its Second Amended Complaint, Apani alleges that CCE's conduct in entering into an exclusive contract with the City was "wanton, improper, unlawful, and unfair, in that the structure of the Agreement constituted an illegal restraint of trade and intentional interference with [its] business relations, both existing and prospective. . . . Such conduct constitutes a violation of the antitrust laws . . . and/or such conduct was illegal in causing the City of Lubbock to refuse to deal with Apani." Having already concluded that CCE has not violated any antitrust laws, and that entering into an exclusive agreement, in and of itself, does constitute an unreasonable restraint on trade, we affirm the district court's ruling on this issue.

B.  Tortious Interference with a Prospective Business Relationship

The Texas Supreme Court has not yet set out all the elements of a tortious interference with a prospective business contract or relations claim, and the appellate courts have not been uniform in their characterization of such actions. Tortious interference wit h business relationships, in the

20

context of prospective relationships, has been identified with two sets of elements. Some courts have found that such a claim requires: (1) a reasonable probability that the parties would have entered into a *business relationship*, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference. Robles v. Consolidated Graphics, Inc., 965 S.W.2d 552, 561 (Tex. App. 1997). Other courts differ with regard to the first element by demanding that the plaintiff establish a reasonable probability that the parties would have entered into a *contractual relationship*. Santa Fe Energy Operating Partners, L.P. v. Carrillo, 948 S.W.2d 780, 784 (Tex. App. 1997). The district court adopted the standard set out in Santa Fe Energy Operating Partners, L.P. and concluded that Apani failed to establish that there was a reasonable probability it would have entered into a *contractual relationship* with the City, but for the exclusive agreement. Apani argues that the district court improperly determined that it could not establish its claim, absent proof of a prospective contract.

Although the Texas Supreme Court has not specifically set forth all of the elements necessary for a tortious interference with prospective business relations cause of action, it has recently recognized that "to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." See Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 713 (Tex. 2001). The court clarified that "[b]y 'independently tortious' we mean conduct that would violate some other recognized tort duty." Id. Based on Sturges, the district court alternatively concluded that CCE was entitled to judgment as a matter of law since Apani had not shown any unlawful conduct on the part of CCE. Apani concedes that Sturges requires it to show that CCE's

21

conduct was independently tortious or unlawful. However, Apani claims that it has met this burden because it alleged violations of state and federal antitrust statutes, the Texas Constitution, and municipal statutory bidding laws. As stated previously, we have found no violations of antitrust law. Further, for the reason discussed below, Apani has also failed to establish claims under either the Texas Constitution, or municipal bidding statutes. Thus, we agree with the district court that Apani's claim must fail for the same reason its existing business relations claim fails–the absence of an unlawful act. Because a determination of whether a prospective contract is required to establish a claim for tortious interference of prospective business relations will not affect the outcome of this case, we find it unnecessary to decide the issue today, and decline to do so.

VI.    Civil Conspiracy

To prove a cause of action for civil conspiracy under Texas law, a plaintiff must establish the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983). Solely at issue here is whether Apani raised a fact issue with regard to an unlawful overt act to support its conspiracy cause of action. Apani alleges three independent unlawful acts, each of which Apani contends would individually support the civil conspiracy claim. First, it alleges that the creation of the agreement between CCE and the City violates Article I, Section 26 of the Texas Constitution. Second, Apani avers that the exclusive agreement was created in violation of Texas statutory bidding requirements under Section 252.021 of the Texas Government Code. Lastly, Apani contends that its separate claims for tortious interference with business relations may also support a civil conspiracy claim. Having concluded that Apani has not met the essential elements of a tortious interference claim, we

22

will address only the alleged violations of the Texas Constitution and the statutory bidding laws.

A.      Texas Constitution

Article I, Section 26 of the Texas Constitution provides that "[p]erpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State." TEX. CONST. art. I § 26. Texas courts, however, have recognized several exceptions to this general rule of law. These exceptions are: (1) contracts between an agent and its principal wherein the agent is prohibited from dealing for himself or representing others besides his principal, (2) contracts involving the sale of a business in which the seller agrees not to engage in a competing business for a limited time, (3) lease agreements that require the lessee to sell only certain products on the leased premises, and (4) "cases in which an exclusive right or privilege is granted only upon the property or premises of the grantor." Airport Coach Serv., Inc. v. City of Fort Worth, 518 S.W.2d 566, 572 (Tex. App. 1974).

Apani asserts that the exclusive agreement violates Section 26's prohibition against states and their political subdivisions granting monopolies. CCE argues that the TFEAA provides the exclusive cause of action for claims concerning monopolies and that Apani's claim under the TFEAA had been previously found by the district court to be without merit. Alternatively, it contends that if this court concludes that Apani can assert a claim under the Texas Constitution independent of the TFEAA, Apani is still unable to prove a violation because CCE has met one or more of the exceptions under the constitutional provision. Lastly, CCE contends that its agreement with the City does not fall within the meaning of "monopoly" established by the Texas Supreme Court. [7]

[7]CCE also claims that in order to show a violation of Article I, Section 26 of the Texas Constitution, Apani must establish the elements necessary to sustain a cause of action under federal antitrust laws, namely, a relevant market. The district did not address this issue. Because we find

23

After analyzing the cases relied on by Apani in support of its proposition that the exclusive right granted by the agreement violated Section 26, the district court concluded that the factual pattern here is totally distinguishable from the cases cited by Apani. See Jones v. Carter, 101 S.W. 514 (Tex. App. 1907); see also Ennis Waterworks v. City of Ennis, 44 S.W. 930, 934-35 (Tex. 1912) (holding that under Article I, Section 26 of the Texas Constitution, a municipal corporation is without the power to grant an exclusive franchise to a water company); Lea County Elec. Co-op., Inc. v. City of Plains, 373 S.W.2d 90, 93 (Tex. App. 1963) (finding that a city does not have a right to grant an exclusive franchise to itself or anyone else for the furnishing of electric energy to its inhabitants). Specifically, the court noted that these cases

> involved a city making an agreement with a third party, providing exclusive right to that party to provide either water, electric, or all utilities to that city and all of its inhabitants. The citizens of those cities were forced to purchase electrical, water or other utilities for their private consumption in their homes from a party the city chose to grant an exclusive franchise. In the instant action, however, the agreement is limited to the purchase of non-alcoholic beverages at 27 City facilities. Coke was not granted an exclusive right to sell its products throughout the City to the exclusion of other companies, including Apani.

We agree that this case does not involve the degree of exclusivity required to constitute a "monopoly" under the Texas Constitution. We therefore uphold the district court's conclusion on this issue.

In addition to finding that Apani has failed to show a monopoly, the district court also determined that the agreement fell within one of the exceptions to Section 26. The court reasoned that since the subject property was owned by the City, the fourth exception under Airport Coach Services, Inc., i.e. cases in which an exclusive right or privilege is granted upon the property of the grantor, applies to this case. We agree. In Airport Coach Services, Inc., a Texas appellate court was

that Apani has failed to demonstrate a viable cause of action under Section 26, we need not address this alternative basis for affirmance.

24

presented with the issue of whether Dallas and Fort Worth, Texas, violated Section 26 by granting exclusive rights to a single business to provide ground transportation services at Dallas/Fort Worth Regional Airport. Finding that the airport was owned exclusively by the two cities, the court concluded that the agreement fell within the fourth exception, and therefore the grant of the exclusive contract for ground transportation services was not a prohibited monopoly. Apani argues that the court's reliance on Airport Coach Services, Inc. was misplaced because the court failed to take into consideration that the agreement gives CCE exclusive rights on property not only owned by the City, but also operated by the City. As stated previously, Apani has not shown that the facilities operated by the City are not also owned by the City. Thus, this argument is without merit. Finding no meaningful distinction between the situation presented here, and that addressed in Airport Coach Services, Inc., we conclude that the exclusive agreement met the fourth exception to Section 26. Because Apani is unable to show a violation of the Texas Constitution independent of the TFEAA, a determination of whether the TFEAA provides the exclusive remedy in Texas for monopoly claims is unnecessary.

  B.  Statutory Bidding Laws

  Lastly, Apani alleges that CCE and the City negotiated a contract for the sale of beverages without complying with statutory bidding requirements set forth in Section 252.001 et. seq. of the Texas Local Government Code. Section 252.021(a) provides in relevant part that "Before a municipality may enter into a contract that requires an expenditure of more than $25,000 from one or more municipal funds, the municipality must . . . comply with the procedure prescribed by this chapter for competitive sealed bidding or competitive sealed proposals." TEX LOC. GOV'T. CODE § 252.021(a)(1) (Vernon 1999). Primarily, Apani contends that the statutory bidding laws were violated

25

because no bidding was permitted on the exclusive beverage contract. In the district court, CCE presented several arguments as to why the court should not allow this claim to form the basis of Apani's conspiracy cause of action. The district court rejected all of CCE's contentions except for one. The court agreed with CCE that Apani failed to submit any evidence that CCE intentionally conspired with the City to violate the bidding laws. In Texas, a "civil conspiracy requires specific intent." Triplex Comms., Inc. v. Riley, 900 S.W.2d 716, 719 (Tex. 1995). Proof that a defendant "intend[ed] to engage in the conduct" is insufficient. Id. Instead, "[f]or a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." Id. CCE argues that it not only was unaware of any violation, but it specifically negotiated a provision in the agreement requiring the City to represent that it had full authority to enter into the agreement. A review of the record reveals that Apani has not presented any evidence countering CCE's assertion of lack of intent. Therefore, the district court properly granted CCE judgment as a matter of law on this issue.[8]

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's rulings dismissing all of Apani's claims.

---

[8]With respect to Apani's assertion that the alleged violation of the bidding laws is an unlawful act, which may support its tortious interference claim, we find this argument meritless. As the district court correctly stated, in denying Apani's motion to alter or amend summary judgment, Apani had failed to address or provide any authority supporting its conclusion that an independent cause of action under the Texas bidding statutes may be asserted against a third party who enters into a contract with a governmental entity. Since Apani did not present any evidence at the district court level on this issue, nor argue this question in its brief, we conclude that the issue is not properly before us. St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 445 (5th Cir. 2000) ("[W]e deem abandoned those issues not presented and argued in an appellant's initial brief, nor do we consider matters not presented to the trial court.").

26

AFFIRMED.