IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 25, 2008

Charles R. Fulbruge III
Clerk

No. 07-50640

NANO-PROPRIETARY INC, a Texas corporation

Plaintiff-Appellee-Cross-Appellant

v.

CANON INC; CANON USA INC, a New York corporation

Defendants-Appellants-Cross-Appellees

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, BENAVIDES, and OWEN, Circuit Judges.

BENAVIDES, Circuit Judge:

This case arises from a patent license agreement between Nano-Proprietary, Inc. ("Nano") and Canon, Inc. ("Canon"). Canon went into business with Toshiba, Inc. ("Toshiba") and formed a joint venture–SED, Inc. ("SED"). Believing that SED used Canon's license in violation of the patent license agreement, Nano sued Canon in federal district court. The district court found that Canon materially breached the patent license agreement via an impermissible sublicense to SED, such that Nano was entitled to terminate the agreement. The issue of damages was tried before a jury, which found that Nano was not entitled to any damages based on the value of a prospective license. We AFFIRM in part and REVERSE in part.

I.

Nano is a Texas-based corporation that conducts nanotechnology research and owns field emission display ("FED") patents. FED is relevant to the development of flat-panel television technologies. Canon, a Japanese corporation, produces, inter alia, copiers, printers, and cameras. In 1997, Canon began discussions with Toshiba, another Japanese corporation and leading television manufacturer, about joint development of FED televisions.

In December 1998, Nano and Canon began negotiations regarding licensing Nano's FED patents. During these negotiations, Canon did not mention its ongoing discussions with Toshiba. On March 26, 1999, Nano and Canon executed a patent license agreement ("PLA") that granted Canon and its subsidiaries a nonexclusive license to Nano's FED patents.[1] Canon paid a one-time lump sum of $5,555,555.55 and received a "fully paid-up, worldwide, royalty-free, irrevocable, perpetual, nonexclusive license (without the right to sublicense)" that "shall continue in full force and effect until expiration of the last to expire of the LICENSED PATENTS." The PLA further provided that it "shall be construed by and interpreted in accordance with the laws of the state of New York, United States of America, exclusive of its choice of law provisions."

On June 9, 1999, Canon and Toshiba executed a written Joint Development Agreement and began joint research and development work in Japan with the companies having equal control. In 2004, Canon and Toshiba began discussions about forming a joint venture. According to Canon, "[b]oth 50/50 ownership and Canon-majority ownership were discussed, and Canon explained that, if it owned a majority, then the joint venture would be licensed as a Canon Subsidiary." On September 14, 2004, Canon and Toshiba executed

---

[1] "A nonexclusive license grants merely a privilege of protection from infringement claims by the owner of the patent monopoly. The licensee has no property interest in the patent monopoly . . . [and] the licensor may freely license others . . . ." 60 Am. Jur. 2d Patents § 1045 (2008).

a Joint Venture Agreement ("JVA") providing that, at all times, Canon's shares in SED must exceed Toshiba's shares by one share.[2] The JVA provided that many important governance matters "shall require the prior written agreement of both companies."[3] The next day, Canon and Toshiba executed a memorandum (the "Memorandum") providing that "[b]oth companies shall select and nominate an equal number of directors and auditors." At all relevant times, SED has conducted research and development using the FED patents in Japan but has not produced or marketed any products.

On April 11, 2005, Nano filed suit against Canon and Canon USA (who is not a party to this appeal) asserting: (1) Canon materially breached the PLA by sublicensing its patents to SED/Toshiba; and (2) Canon tortiously interfered with Nano's prospective business relations (specifically, its prospective license with SED/Toshiba). In addition, Nano sought a declaratory judgment that SED did not qualify as a subsidiary under the PLA.[4] In October 2005, the district court dismissed Nano's count for tortious interference with prospective business relations pursuant to Federal Rule of Civil Procedure 12(b)(6). In April 2006, Nano amended its complaint, adding claims that Canon committed fraud during the PLA negotiations and seeking rescission of the PLA. Canon moved for partial summary judgment on Nano's breach of contract and declaratory judgment claims on the ground that SED qualified as a Canon subsidiary, which

---

[2] Both Canon and Toshiba paid 50,000 yen per share, with Toshiba spending approximately $83 million in total.

[3] These matters included: issuing new stock, medium and long-term business plans, business tie-ups with important third parties, annual budgets, borrowing and issuing of corporate bonds, capital subscription, disposing of important assets, installation and closing of key sites, lawsuits, contracts with Canon and/or Toshiba, and important equipment investment.

[4] Section 1.3 of the PLA defines "subsidiary" in pertinent part as "any corporation [that] . . . owns or controls directly or indirectly more than fifty percent (50%) (by nominal value or number of units) of the outstanding stock conferring the right to vote at general meetings."

3

the district court denied. The district court found that SED was not a subsidiary of Canon because Canon did not hold a majority of "stock conferring the right to vote at general meetings" and, alternatively, because the court declined on equitable grounds "to recognize a corporate fiction designed for the sole purpose of evading Canon's contractual obligations." Nano-Proprietary, Inc. v. Canon Inc., No. A-05-CA-258-SS, slip op. at 10-11 (W.D. Tex. Nov. 14, 2006). Specifically, the district court found that Canon's agreement "not to use its majority share to outvote Toshiba on matters governed by the" JVA meant that Canon "does not hold a majority of 'stock conferring the right to vote at general meetings.'" Id. at 10.

On December 1, 2006, Nano informed Canon that it was terminating the PLA. Canon disputed Nano's right to terminate and informed Nano that its purported termination was ineffective. Nonetheless, Canon began to restructure SED to be 100% owned by Canon and informed both Nano and the district court of this restructuring. On January 12, 2007, Canon and Toshiba executed a Stock Transfer Agreement, and on January 29, Canon bought all of Toshiba's stock in SED for approximately $83 million–the same amount that Toshiba had originally paid. Immediately thereafter, Canon moved for summary judgment that SED, in its new structure, was a Canon subsidiary. Nano moved for summary judgment regarding whether Canon had breached the PLA and whether its termination of the PLA was effective. On February 22, 2007, the district court granted Nano's motion, finding that: (1) SED in its original form was not a Canon subsidiary; (2) Canon had materially breached the PLA because creating SED "was effectively an attempt to sublicense its rights to the Nano patents"; (3) Nano was damaged by this breach (although the district court did not assign a value to this damage); (4) Nano's termination of the PLA was effective; and (5) Canon's restructuring of SED was ineffective to prevent termination because it "was not undertaken within a reasonable time." Nano-

Proprietary Inc. v. Canon Inc., No. A-05-CA-258-SS, 2007 WL 628792, at *3-14 (W.D. Tex. Feb. 22, 2007). The district court permitted Nano to retain the approximately $5.5 million lump sum payment from Canon. Id. Furthermore, the district court noted that it "did not see how there were provable consequential damages" but nonetheless permitted Nano to attempt to prove such damages at trial. Nano-Proprietary, Inc. v. Canon Inc., No. A-05-CA-258-SS, slip op. at 3 n.1 (W.D. Tex. May 4, 2007).

From April 30 to May 3, 2007, Nano's remaining fraud and damages claims were tried before a jury. At the close of Nano's evidence, Canon moved for judgment as a matter of law on the fraud claim, and Nano voluntarily dismissed its fraud claim. The damages claim went to the jury, and it returned a verdict that Nano had not sustained any "damages from Canon's conduct in addition to the termination of the patent license agreement and retention of the $5.5 million purchase price." Thus, Nano took nothing further as a result of the jury trial.[5] Canon timely appealed from the district court's summary judgment orders, and Nano timely cross-appealed various trial rulings and the dismissal of its tortious interference with prospective business relations claim.

## II.

The district court's grant of summary judgment is reviewed de novo. Gonzalez v. Denning, 394 F.3d 388, 391 (5th Cir. 2004). The district court's evidentiary rulings, including admission of expert witness testimony, is reviewed for abuse of discretion. Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 584 (5th Cir. 2003). Nano's tortious interference claim, which was dismissed under Rule

---

[5] In its May 4, 2007, Order, the district court stated: "[H]ad the jury reached any other conclusion, [Canon] would have been entitled to judgment notwithstanding the verdict. [Nano] wholly failed to provide competent evidence of damages, and any award would have been entirely speculative." Nano-Proprietary, Inc. v. Canon Inc., No. A-05-CA-258-SS, slip op. at 3 (W.D. Tex. May 4, 2007).

12(b)(6), is reviewed de novo. Apani Sw., Inc. v. Coca-Cola Enters., Inc., 300 F.3d 620, 624 (5th Cir. 2002).

### III.

Nano argued before the district court that Canon breached the PLA when it permitted SED to use the licensed patents. Because of this breach, Nano sought termination of the PLA and damages based upon the value of a prospective license with SED.[6] The district court granted the former, and the jury denied the latter. Canon argues here that the district court erred in its underlying finding of breach and in permitting Nano to terminate the PLA. Specifically, Canon argues that the district court erred by finding that: (1) SED was not a subsidiary of Canon under the PLA, such that SED was not entitled to use of the licensed patents; (2) SED's use of the licensed patents was an impermissible sublicense constituting breach of the PLA; and (3) Nano was entitled to terminate the PLA notwithstanding that the PLA granted a "perpetual" and "irrevocable" license to Canon. For the reasons explained below, we find that–even assuming that Canon breached the PLA–Nano cannot recover any of the relief it seeks, i.e., termination of the PLA or damages based upon the value of a prospective license. Accordingly, we assume, without deciding, that the district court properly found that SED was not a subsidiary of Canon and Canon breached the PLA via an impermissible sublicense. We now turn to address the termination and damages issues.

In its order of February 22, 2007, the district court found that Nano's termination of the PLA was effective because, inter alia, Nano could not be adequately compensated through damages and Canon's breach was willful and intentional. Canon first argues that the district court erred because, under New York law, termination requires a material breach, see Cary Oil Co. v. MG Ref.

---

[6] Although Nano technically sought rescission in its amended complaint, the district court properly noted that termination, not rescission, is at issue in this case.

& Mktg., Inc., 90 F. Supp. 2d 401, 408 (S.D.N.Y. 2000), and Canon's breach of the PLA was not material. We disagree. The PLA expressly provided that Canon received a nonexclusive license "without the right to sublicense." Accordingly, assuming that Canon impermissibly sublicensed to SED, such action is in direct contravention of the PLA and materially breached the agreement.

Canon next argues that, based upon the plain language of the PLA, Nano's termination was improper because the PLA granted an "irrevocable," "fully paid-up," and "perpetual" license. We agree. Under New York law, "words and phrases used by the parties must . . . be given their plain meaning." Brooke Group Ltd. v. JCH Syndicate 488, 87 N.Y.2d 530, 534 (N.Y. 1996). The term "irrevocable" is defined as "[u]nalterable; committed beyond recall," Black's Law Dictionary 848 (8th ed. 2004), or "[i]mpossible to retract or revoke," The American Heritage College Dictionary 719 (3d ed. 1993). Based upon the unambiguous meaning of "irrevocable," we find that the PLA could not be terminated, notwithstanding a material breach of the agreement. Otherwise, the terms "irrevocable" and "perpetual" would be rendered superfluous, in contravention of established rules of contract interpretation.[7] See Laywers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co. of N.Y., 94 N.Y.2d 398, 404 (N.Y. 2000).

Nano responds that under well-established principles of contract law, where a party commits a material breach the non-breaching party is entitled to terminate the agreement. See, e.g., Olin Corp. v. Cent. Indus., Inc., 576 F.2d

---

[7] We note that there is disagreement amongst leading licensing treaties on this issue. Compare Raymond T. Nimmer & Jeff Dodd, Modern Licensing Law § 9:16 (2006) ("We understand these terms [irrevocable or perpetual] to mean that . . . the license cannot be terminated by the licensor or otherwise ended except for breach by the licensee.") (emphasis added) with Roger M. Milgrim, Milgrim on Licensing § 27.02 (2008) ("Often a license is of such critical value to an enterprise or an undertaking that the prospective licensee may seek to make the license irrevocable despite nonpayment or other material breach. . . . There are a variety of ways of achieving irrevocability. The simplest is to simply provide that: The license conferred under this Agreement shall be perpetual and irrevocable.").

642, 647 (5th Cir. 1978). Furthermore, Nano asserts that a patent license may be terminated even absent an express termination clause. See Dow Chem. Co. v. United States, 226 F.3d 1334, 1346 (Fed. Cir. 2000). Nano's legal assertions are accurate, but they are inapposite because Dow and the other cases Nano relies upon did not involve an irrevocable license.

Simply put, Nano was not entitled to terminate the license because it contracted for an irrevocable and perpetual license. At the time of material breach, Nano was entitled to sue Canon under any available form of relief, but termination of the PLA was not permissible.

## IV.

Canon next argues that SED in its restructured, 100% Canon-owned form qualifies as a subsidiary under the PLA. Because Canon now owns all of the "stock conferring the right to vote at general meetings," "has the right to elect the majority of the board of directors," and has the right to "appoint or remove management," we agree that SED qualifies as a subsidiary under the definition provided in Section 1.3 of the PLA. As a result, SED's use of the FED patents is permissible under its current ownership structure.

## V.

We now turn to Nano's cross-appeal. Nano argues that: (1) the district court erred by prohibiting Nano's damages expert from presenting his opinion on the amount of damages Nano suffered; (2) the district court erred in excluding evidence of Canon's $83 million buyout of Toshiba; (3) the district court's jury instructions regarding damages were erroneous; and (4) the district court erred in dismissing Nano's claim for tortious interference with prospective business relations. We find that Nano's arguments lack merit and affirm the district court's judgment regarding the cross-appeal in all respects.

A. Nano's Damages Expert

At trial, after Nano voluntarily dismissed its fraud claim, the only remaining issue was the amount of Nano's damages resulting from Canon's breach of the PLA. Nano presented an expert witness, Dr. James Koch, who intended to present testimony regarding the value of the purported lost license based upon a buyer-seller convergence model that measures the value of the lost license from three perspectives: the buyer (Canon, Toshiba, or SED), the seller (Nano), and the market (relying upon fluctuations in Nano's stock price over several years).

At trial, Dr. Koch–in describing how he calculated the value of the lost license from Nano's perspective–relied upon an internal Canon document that Nano never saw during negotiations. This document was a confidential document between Canon and Toshiba that projected future sales for SED. The district court precluded Dr. Koch from testifying based upon this document because Nano had no evidence that the document would ever have been available to Nano. Dr. Koch, however, was allowed to rely upon this document to testify as to the lost asset's value from Canon's perspective. Furthermore, Dr. Koch was allowed to testify about movements in Nano's stock price between 1997 and 2006, but the district court did not permit him to testify about the purported relationship between those fluctuations and the value of the lost asset because it found such testimony was wholly speculative.

Regarding Canon's internal document, Nano argues that, under New York law, determining the fair market value of the lost asset requires that both parties have "reasonable knowledge of relevant facts." Schonfeld, 218 F.3d at 178 (internal quotation marks and citation omitted). At a realistic bargaining table, however, Nano would not have knowledge of the contents of Canon's internal document. It cannot be the case that having "reasonable knowledge of relevant facts" requires knowledge of all of the opposing party's secret documents. See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116,

1122 (S.D.N.Y. 1970) (noting that when analyzing a hypothetical negotiation, "the Court must take into account the realities of the bargaining table"). We find that the district court's ruling was not an abuse of discretion.

Regarding the stock market testimony, after reviewing the record, we find that the district court properly precluded testimony about a correlation between fluctuations in Nano's stock and any lost license as too speculative.

B. Evidence of Canon's $83 Million Buyout of Toshiba

During trial, Nano sought to introduce evidence that Canon paid approximately $83 million to Toshiba and agreed to indemnify Toshiba in January 2007 when SED was restructured as a 100% Canon-owned subsidiary. This was the same amount that Toshiba originally paid for its shares of SED. Nano sought to introduce this figure as evidence of the value of its lost license to SED. The district court refused, finding that any correlation between the $83 million and the value of a license was speculative. The district court noted that the $83 million figure could have merely reflected the amount Toshiba paid into the joint venture and was not tied to the value of a license.

Nano argues that the district court used the wrong legal standard when it stated: "I don't have any independent evidence that would lean more to one side than the other; therefore, it's just rank speculation. . . ." Nano argues that it should not be required to produce "independent" evidence. Although the district court's statement is poorly worded, taken in the context of several pages of trial transcript, the court was saying that Nano did not produce evidence to support its claim that $83 million represents the value of the lost license. We find that the district court did not use an improper legal standard.

Furthermore, Nano argues that the $83 million figure is not speculative because it represents the "best evidence" of the value of the license. See Schonfeld, 218 F.3d at 178-79 ("[I]t is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence'

of its market value."). This argument is flawed because the $83 million is not a "recent sale price for the subject asset"—i.e., the lost license. Id. Thus, the "best evidence" standard articulated in Schonfeld is not implicated here. Therefore, we find that the district court properly excluded evidence regarding Canon's $83 million buyout of Toshiba.

C. Jury Instructions Regarding Contract Damages

The district court instructed the jury that the only question before it was "whether Nano sustained damages as a result of Canon's breach of the 1999 patent licensing contract in addition to its retaining the $5.5 million purchase price of the license and terminating the contract."[8] Nano argues that the jury instructions were erroneous because under New York law: (1) termination of the PLA was not relevant to the fair-market value of the lost license and (2) Nano's retention of the $5.5 million was irrelevant because a non-breaching party who terminates a contract may keep prior payments rendered and sue for damages.[9]

We need not decide this issue because, as discussed in Part III, supra, we find that Nano is not entitled to damages based on the value of a prospective license because it did not prove such damages "with reasonable certainty." Schonfeld, 218 F.3d at 177. Therefore, even if Nano is correct that the jury instructions were erroneous, it is not entitled to a remand on this basis.

D. Tortious Interference with Prospective Business Relations

---

[8] Accordingly, the jury instruction form provided: "Do you find by a preponderance of the evidence that Nano sustained damages from Canon's conduct in addition to the termination of the patent license agreement and retention of the $5.5 million purchase price?" (emphasis added). If the jury answered "Yes," it was next asked: "What amount of money, if any, beyond the $5.5 million which Plaintiff has been allowed to retain and the termination of the license agreement, would fairly and reasonably compensate Plaintiff for its damages from Canon's conduct." (emphasis added). The jury answered "No" to the first question, so it did not reach the second question.

[9] We note that Nano does not contest the jury's finding of no damages. To the extent a complaint is made, it is with respect to the district court's jury instructions.

The district court dismissed Nano's tortious interference claim, finding that Nano "did not identify a contract that was reasonably likely to occur." Nano-Proprietary, Inc. v. Canon Inc., No. A-05-CA-258-SS, slip op. at 9 (W.D. Tex. Oct. 14, 2005). The district court noted that "Texas courts have held that to establish a reasonable probability of entering into a contractual relationship, '[m]ore than mere negotiations must have taken place.'"[10] Id. at 9-10 (quoting Milam v. Nat'l Ins. Crime Bureau, 989 S.W.2d 126, 132 (Tex. App. 1999)). Because "the negotiation stage [between Nano and SED or Toshiba] had not even begun at the time of Canon's alleged acts of interference," the district court found that Nano "failed to plead a reasonable probability that it would have entered into a contract with Toshiba but for Canon's conduct." Id. at 10.

This Court previously noted that "[t]he Texas Supreme Court has not yet set out all the elements of a tortious interference with a prospective business contract or relations claim, and the appellate courts have not been uniform in their characterization of such actions." Apani Sw., Inc. v. Coca-Cola Enters., Inc., 300 F.3d 620, 634 (5th Cir. 2002). "Some [Texas intermediate] courts have found that such a claim requires: (1) a reasonable probability that the parties would have entered into a business relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's inyeaterference." Id. (citing Robles v. Consol. Graphics, Inc., 965 S.W.2d 552, 561 (Tex. App. 1997)). However, "[o]ther [Texas intermediate] courts differ with regard to the first element by demanding that the plaintiff

---

[10] Although the PLA provides that it "shall be construed by and interpreted in accordance with the laws of the state of New York," the parties do not dispute that Texas law governs Nano's tortious interference with prospective business relations claim. See Thompson & Wallace of Memphis, Inc. v. Falconwood Corp., 100 F.3d 429, 433 (5th Cir. 1996) (applying New York law to contractual claims but Texas law to tort claims).

establish a reasonable probability that the parties would have entered into a contractual relationship." Id. (citing Santa Fe Energy Operating Partners, L.P. v. Carrillo, 948 S.W.2d 780, 784 (Tex. App. 1997)). In sum, some cases require a "business relationship" while others require a "contractual relationship."

Accordingly, Nano is correct that–under one line of cases–it need not identify a specific contract that would have occurred. However, the "business relationship" versus "contractual relationship" distinction is of no consequence here because Nano presented no evidence of a reasonable probability of either an impending business relationship or contractual relationship. Therefore, the district court's dismissal of Nano's tortious interference with prospective business relations claim is affirmed.

VI.

In light of the foregoing, we affirm the district court's judgment insofar as it denied damages to Nano and dismissed Nano's tortious interference with prospective business relations claim. We reverse the district court's judgment insofar as it found that Nano's termination of the PLA was effective and denied that SED in its restructured form is a subsidiary of Canon. Therefore, we AFFIRM in part and REVERSE in part.