**STAR TOBACCO, INC., Plaintiff,**

v.

**D. David DARILEK, Jr., Jeff Cotten, Andrew Gornall, Dennis Schocron, Derek Lind, DDM Enterprises, Ltd. d/b/a Crown Distributing, Defendant.**

No. 4:03–CV–313.

United States District Court,
E.D. Texas,
Sherman Division.

Dec. 23, 2003.

Paul E. Ridley, of Kirkpatrick & Lockhart, Dallas, TX, for Plaintiffs.

Gregory William Carboy of Cowles & Thompson, Dallas, TX, Jeff C. Spahn, Jr. of Martin, Pringle, Oliver, Wallace and Bauer, Wichita, KS, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM

SCHELL, District Judge.

This matter is before the court on Plaintiff's "Motion to Dismiss Defendants' Counterclaim Pursuant to Rule 12(b)(6) and Brief in Support" (Dkt.# 10), filed October 27, 2003. After consideration of the briefing and the applicable law, the court is of the opinion that Plaintiff's motion should be granted in part and denied in part.

### I. BACKGROUND

Plaintiff and Defendants are competitors in the cigarette market in Texas. Defs.' Ans. to Compl. & Counterclaim at 5. Plaintiff Star Tobacco is a Virginia corporation that manufactures discount cigarettes to sell to Texas cigarette distributors. Compl., ¶ 13. Additionally, Star purchases some of its cigarettes back from the Texas distributors and sells them directly to retailers as a promotion. *Id.* If the retailer is satisfied with the Star prod-

uct and wants to continue to carry it, Star directs the retailer to the nearest wholesaler carrying Star products. *Id.*

Five of the individual defendants are former Star employees. Defs.' Mem. in Opp. to Pl.'s Mot. to Dismiss at 1. The remaining individual defendant, Derek Lind, did not work for Star. Defs.' Ans. to Compl. & Counterclaim at 5. Lind worked for a cigarette distributor in Texas named A.B. Coker. *Id.* The final defendant is DDM Enterprises, Ltd., which does business as Crown Distributing. DDM is a corporation formed by the individual defendants. Defs.' Mem. in Opp. to Pl.'s Mot. to Dismiss at 1. Defendants intended DDM to make money by marketing and distributing discount cigarettes, including those manufactured by Star. *Id.*

The roots of this dispute are found in Defendants' formation of DDM. Plaintiff alleges that Defendants initially planned for DDM "to purchase the Texas operations of the distributor for which Lind worked and to operate that business." Compl., ¶ 20. Plaintiff claims that DDM planned to generate revenue selling Star products, its own in-house brand of discount cigarettes, and other imported discount cigarettes. *Id.* In order to boost sales of DDM's own in-house brands, Plaintiff alleges that Defendants "planned to piggy back off of Star's sales, i.e., to offer good prices or terms on Star products on the condition that customers also bought their brands." *Id.* Plaintiff claims that DDM eventually purchased a different cigarette distributor but alleges that DDM would nevertheless compete with Star by selling its own brand of discount cigarettes. *Id.,* ¶¶ 23–25.

Ultimately, Plaintiff claims that several of the individual defendants used their positions of authority as employees of Star to injure Star Tobacco. Defendants allegedly did this to pave the way for the success of DDM. *Id.,* ¶ 21. Specifically, Plaintiff alleges that Defendant Darilek, the head of Star's sales staff in Texas, "ordered his conspirators at Star to 'lay down' and to stop aggressively promoting Star's brands." *Id.* Darilek allegedly wanted Star to make fewer sales so that Star's customers would have more money available to purchase cigarettes from DDM. *Id.*

Thereafter, Plaintiff alleges that DDM conspired with A.B. Coker and one other cigarette distributor to "limit competitive pressure" and stabilize discount cigarette prices in Texas by limiting "competition on exclusive brands." *Id.,* ¶ 29. More specifically, DDM and its alleged co-conspirators purportedly agreed to decrease sales on Star brands for the purpose of fueling "the growth of more profitable discount brands." *Id.* Additionally, Plaintiffs claim that "[t]he conspirators planned to drive the price down to retailers but not to wholesalers and to short customers on Star products while blaming Star for the shortages. They would use the shortages to switch customers to their products." *Id.,* ¶ 30. Plaintiff claims that these actions have cost Star over $2 million in lost sales. *Id.,* ¶¶ 35 & 38.

Defendants deny the majority of Plaintiff's allegations and claim that it is Plaintiff who has acted inappropriately. Defendants claim that when Plaintiff became aware that DDM was trying to organize and engage in business in Texas, Plaintiff then attempted to run Defendants out of business by "boycotting any business that agreed to do business with [Defendants], refusing to sell cigarettes to any business that had agreed to do business with [Defendants], [and] giving price reductions if customers did not do business with defendants...." Defs.' Ans. to Compl. & Counterclaim at 5. Further, Defendants claim that Plaintiff sold cigarettes to its customers "with the understanding or

agreement that those customers ... would raise the prices of cigarettes sold by defendants," and claim that "[o]ne of the intended effects of this scheme is to lessen competition in the discount cigarette business in the State of Texas." *Id.*, at 6.

## II. PROCEDURAL POSTURE

On August 22, 2003, Plaintiff Star Tobacco filed a complaint alleging generally that Defendants violated their fiduciary duties to Plaintiff, conspired to commit tortious and illegal acts against Plaintiff, and tortiously interfered with Plaintiff's prospective business relations. Compl., ¶¶ 11–14. In response, Defendants filed a counterclaim, alleging that Plaintiff has violated § 15.05 of the Texas Free Enterprise and Antitrust Act of 1993 ("TFEAA") and has tortiously interfered with Defendants prospective business relations.[1] Defs.' Ans. to Compl. & Counterclaim at 6–7.

Thereafter, Plaintiff moved the court to dismiss Defendants' antitrust and tort counterclaims. Generally, Plaintiff claims that Defendants have failed to allege facts sufficient to support their counterclaim. Mot. to Dismiss Defs.' Counterclaim Pursuant to Rule 12(b)(6) & Br. in Supp. ay 1–2. The question now before the court is whether Defendants have pled facts sufficient to support their counterclaim.

## III. ANALYSIS

An order granting a Rule 12(b)(6) motion to dismiss is "appropriate where 'it appears beyond doubt that the plaintiff can provide no set of facts in support of his claim which would entitle him to relief.' " *Bauer v. Texas*, 341 F.3d 352, 356 (5th Cir.2003) (citing *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

"In making this determination, the court accepts as true all allegations contained in the plaintiff's complaint and all reasonable inferences are to be drawn in favor of the plaintiff's claims." *Id.* (citing *Kaiser Aluminum & Chem. Sales Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982)).

In this case, Plaintiff has moved for dismissal of Defendants claims on the grounds that Defendants have failed to adequately plead them. Rule 8(a)(2) of the Federal Rules of Civil Procedure states, "[a] pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a)(2). Rule 8 specifies that each averment of the pleading "shall be simple, concise and direct." Fed.R.Civ.P. 8(e)(1). Rule 8 additionally specifies that "[a]ll pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f).

Pleading requirements in federal courts have been generally characterized as liberal. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir.2000); *accord General Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 950 (5th Cir.1999); *Austin Black Contractors Ass'n v. City of Austin, Tex.*, 78 F.3d 185, 187 (5th Cir.1996). In *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court held that no cause of action is subject to heightened pleading requirements unless it is included in Rule 9(b) of the Federal Rules of Civil Procedure, which establishes heightened pleading requirements only for allegations of fraud and

---

**1.** Defendants informed the court during a December 10, 2003, teleconference that their antitrust counterclaim rests predominantly on § 15.05(c) of the TFEAA.

mistake. In *Leatherman,* the Court reaffirms its holding in *Conley v. Gibson,* that

> the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### A. Defendants' Antitrust Counterclaim

In the wake of *Leatherman,* the Fifth Circuit has held that "judicial attempts to apply a heightened pleading standard in antitrust cases had been 'scotched' by the Supreme Court[ ] ...," and that after *Leatherman,* an "antitrust plaintiff need not include 'the particulars of his claim' to survive a motion to dismiss." *Apani Southwest, Inc. v. Coca–Cola Enterprises, Inc.,* 300 F.3d 620, 631 (5th Cir.2002) (citation omitted) (quoting *MCM Partners, Inc. v. Andrews–Bartlett & Assoc., Inc.,* 62 F.3d 967, 976–77 (7th Cir.1995)). "It is instead sufficient for the plaintiff to include in its complaint only 'a short and plain statement of the claim' showing an entitlement to relief." *Id.*

Nonetheless, an antitrust claimant must allege "facts sufficient to support an antitrust violation." *Apani,* 300 F.3d at 633 (citing *Endsley v. City of Chicago,* 230 F.3d 276, 282 (7th Cir.2000)).

In this case, Defendants allege that Plaintiff has violated § 15.05 of the TFEAA. Defs.' Ans. to Compl. & Counterclaim at 7. Specifically, Defendants allege that Plaintiff attempted to foreclose Defendants from the discount cigarette market by "boycotting any business that agreed to do business with [Defendants], refusing to sell cigarettes to any business that had agreed to do business with [Defendants], [and] giving price reductions if customers did not do business with defendants...." *Id.* Defendants further allege that Plaintiff sold cigarettes to its customers "with the understanding or agreement that those customers ... would raise the prices of cigarettes sold by defendants." *Id.,* at 6. Defendants claim that "[o]ne of the intended effects of this scheme is to lessen competition in the discount cigarette business in the State of Texas." *Id.* Finally, Defendants claim that Plaintiff "engaged in a conspiracy to monopolize or attempt to monopolize trade or commerce in the discount cigarette business." *Id.* As noted above, Defendants base this claim on § 15.05 of the TFEAA, which states in relevant part:

> (a) Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful.
>
> (b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce.
>
> (c) It is unlawful for any person to sell, lease, or contract for the sale or lease of any goods, whether patented or unpatented, for use, consumption, or resale or to fix a price for such use, consumption, or resale or to discount from or rebate upon such price, on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce.

Tex. Bus. & Com.Code § 15.05. TFEAA § 15.05 is intended to be construed in accordance with the corresponding provisions of the federal antitrust statutes. Tex. Bus. & Com.Code § 15.04; *see also Abbott Laboratories, Inc. v. Segura,* 907 S.W.2d 503, 511 (Tex.1995) (Gonzalez, J., concurring). It is well known that §§ 15.05(a) & (b) are analogues of §§ 1 &

2 of the Sherman Act and § 15.05(c) is the analogue of § 3 of the Clayton Act. *Winston v. American Medical Intern., Inc.*, 930 S.W.2d 945, 951 (Tex.App.-Houston [1 Dist] 1996, writ denied); *Caller–Times Pub. Co., Inc. v. Triad Communications, Inc.*, 826 S.W.2d 576, 580 (Tex.1992); *Apani Southwest, Inc. v. Coca–Cola Enterprises, Inc.*, 128 F.Supp.2d 988, 995 (N.D.Tex. 2001), *aff'd* 300 F.3d at 628. Because the provisions are parallel, Texas courts apply Federal judicial interpretations of the corresponding federal antitrust statutes when analyzing the provisions of § 15.05(c). *Caller–Times Pub. Co.*, 826 S.W.2d at 580; *Winston*, 930 S.W.2d at 951.

### 1. Defendants' Exclusive Dealing Claim

Because Defendants informed the court that their antitrust counterclaim rests pre-dominantly on § 15.05(c), *see supra* note 1, the court will analyze that claim first.

In typical antitrust parlance, two types of restraints on trade may be challenged under § 15.05(c): tying restraints and exclusive dealing arrangements, when the result of either arrangement is to substantially lessen competition.[2] *Cf. Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); *Apani*, 300 F.3d at 625. A tying arrangement "involves 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" [3] *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048 n. 5 (5th Cir.1982) (quoting *Northern*

**2.** Both of these types of restraints are known as "vertical" restraints because they involve "agreements between firms at different levels of the chain of distribution." STEPHEN F. ROSS, PRINCIPLES OF ANTITRUST LAW 224 (The Foundation Press 1993). Vertical restraints on trade, including tying and exclusive dealing, may also be challenged under § 15.05(a). *Cf. Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 608, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (stating that tying arrangements are improper under both the Clayton Act and the Sherman Act); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 44–45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring) (stating that exclusive dealing arrangements are subject to scrutiny under the Sherman Act); *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723–24, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (stating that Sherman Act § 1 prohibits vertical non-price restraints that unreasonably restrain trade). In *Tampa Electric Company v. Nashville Coal Company*, 365 U.S. 320, 335, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the Supreme Court found that when vertical arrangements do not violate Clayton Act § 3, they also do not violate the Sherman Act. In Texas, therefore, when arrangements do not violate § 15.05(c), they also do not violate §§ 15.05(a) & (b). *Winston*, 930 S.W.2d at

951; *Caller–Times Pub. Co., Inc.*, 826 S.W.2d at 580; *Apani Southwest, Inc.*, 128 F.Supp.2d at 995. Alleged vertical restraints on trade are generally analyzed the same way whether the claim is brought under § 15.05(a) or § 15.05(c). *Cf. Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 44–46, 104 S.Ct. 1551 (in which Justices O'Connor, Burger, Powell and Rehnquist cited *Tampa Electric Co.*, 365 U.S. 320, 81 S.Ct. 623, and *Standard Oil of California*, 337 U.S. 293, 69 S.Ct. 1051—cases regarding the standards for imposing liability under § 3 of the Clayton Act (also § 15.05(c))—to determine the standards for imposing liability under § 1 of the Sherman Act (also § 15.05(a))). Under either § 15.05(c) or § 15.05(a), the crux of successfully asserting a claim based on exclusive dealing is demonstrating that a "significant fraction of buyers or sellers are frozen out of a market by the exclusive deal." *Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 45, 104 S.Ct. 1551. It is therefore appropriate, where claimants have alleged an exclusive dealing arrangement that violates § 15.05 generally, to consider first whether the arrangement violates § 15.05(c) specifically.

**3.** More recently, the Fifth Circuit discussed the nature of the Clayton Act § 3 prohibition on tying in *Apani*, 300 F.3d at 625. In *Apani*,

*Pacific Railway Company v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). This counterclaim does not involve a tying arrangement because Defendants have not alleged that Plaintiff has conditioned the sale of one product on the buyer's agreement to purchase (or not purchase from Defendants) a second, separate product.

Exclusive dealing, on the other hand, occurs when a sales contract prevents a purchaser "from using or dealing in the goods, etc., of *a competitor* or competitors of the ... seller...." *Tampa Electric Company v. Nashville Coal Company*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (citing *Standard Oil of California v. United States*, 337 U.S. 293, 314, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949)). Exclusive dealing is what Defendants have alleged in this case. Defendants have alleged that Plaintiff told wholesalers and retailers in the discount cigarette business that they could only purchase cigarettes from Plaintiff on the condition that they not purchase cigarettes from Defendants. Defs.' Ans. to Complaint & Counterclaim, ¶ 7.

■ In an effort to duck this counterclaim, Plaintiff has argued that its conduct cannot be characterized as exclusive dealing because "there is no allegation that Star is demanding that buyers deal with it exclusively, but only that they not deal with DDM." Mot. to Dismiss Defs.' Counterclaim Pursuant to Rule 12(b)(6) & Br. in Supp. at 7. The court finds this argument unpersuasive for the reasons outlined below.

It is true that exclusive dealing is generally thought of in terms of requirement and output contracts, which typically require either (1) a seller to sell its entire output of a commodity to a single buyer or (2) a buyer to purchase its entire requirements of a commodity from a single source. *Apani*, 300 F.3d at 625; *see also* Stephen F. Ross, Principles of Antitrust Law 303 (The Foundation Press 1993); *see also, e.g., Standard Oil of California*, 337 U.S. at 295–96 (examining supply contracts obligating nearly 6000 western retail gas stations to purchase all of their gasoline and petroleum products from Standard Oil); *Tampa Electric Company*, 365 U.S. at 322–23, 81 S.Ct. 623 (examining a supply contract obligating *Tampa Electric* to purchase its "total requirements of fuel" from Nashville Coal Company). But to

---

the Fifth Circuit cites *Kaiser Aluminum* for the proposition that "[t]ying restraints occur when a seller agrees to sell one product on the condition that the buyer also agree to purchases (sic) a different, or tied product, *or the buyer agrees that he will not purchase the same product from another supplier.*" *Id.* (emphasis added) (citing *Kaiser Aluminum*, 677 F.2d at 1048 n. 5). This statement appears to suggest that an illegal tying relationship has occurred when a seller conditions the sale of a product on the purchaser's agreement not to purchase any quantity of that same product from another seller. Defendants, at least, have interpreted it that way. *See* Defs.' Mem. in Opp. to Pl.'s Mot. to Dismiss at 7. Such an arrangement, however, is not the typical tying arrangement. Tying arrangements are generally found when a seller with market power in one product market conditions the sale of a product from that market (the tying product) on the purchaser's agreement to purchase another of that seller's products from a market in which the seller does not have market power (the tied product). *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13 n. 19, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In short, tying requires two separate products. *Jefferson Parish*, 466 U.S. at 24–25, 104 S.Ct. 1551. As the Supreme Court has stated, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained...." *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. 1551.

limit the scope of § 15.05(c)'s protections as Plaintiff has suggested would be to ignore the actual language of § 15.05(c). Section 15.05(c) states quite plainly that "[i]t is unlawful for any person to sell ... goods ... for ... resale ... or to discount from or rebate upon such price, on the condition, agreement, or understanding that the purchaser ... shall not use or deal in the goods of *a competitor* or competitors of the seller...." Tex. Bus. & Com.Code § 15.05(c) (emphasis added). The statute's differentiation between "a competitor" and "competitors" cuts against Plaintiff's reading of the statute. This language indicates not only that it is illegal for a manufacturer to condition the sale of goods to some downstream consumer on that consumer's agreement not to purchase the same type of goods from *any* competitor of that manufacturer, but also that the agreement would be illegal if the sale was conditioned on the downstream consumer's agreement not to deal with *any single* competitor of the manufacturer.

The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (citations omitted). "When the words of a statute are unambiguous, then, this first canon [of interpretation] is also the last: 'judicial inquiry is complete.'" *Id.* (citations omitted). In reading the plain language of a statute, the "cardinal principle of statutory construction is to save and not destroy," and the duty of a court interpreting a statute is to "give effect, if possible, to every clause and word of a statute." *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (citations omitted); *accord TRW, Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (stating, "a statute ought, upon the whole,

to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant") (citations omitted).

To follow the Supreme Court's guidance regarding statutory interpretation, is to read § 15.05(c) as the court has above. To do otherwise would be to make superfluous the national and state legislatures' inclusion of the words "a competitor." Inclusion of the singular "a competitor" clearly indicates that a sales agreement conditioned on the buyer's agreement to refuse to purchase from even a single competitor of the seller may be prohibited by Clayton Act § 3 and TFEAA § 15.05(c). Tex. Bus. & Com.Code § 15.05(c). If this were not the case, the Texas Legislature and the United States Congress would have had no need to differentiate between "competitors" and "a competitor."

Admittedly, the antitrust statutes have not generally been found to be so clear as to obviate the need for judicial interpretation. In *Standard Oil of California,* for example, the Supreme Court stated that economics and other considerations support the adoption of different standards of proof for tying and exclusive dealing claims regardless of the fact that the language of § 3 is the same for each. 337 U.S. at 307–08, 69 S.Ct. 1051. Senator Sherman himself said:

> it is difficult to define in legal language the precise line between lawful and unlawful combinations. This must be left for the courts to determine in each particular case. All that we, as lawmakers, can do is declare general principles, and we can be assured that the courts will apply them as to carry out the meaning of the law....

21 Cong. Rec. 2460 (1890).

Accordingly, the methods courts have used to analyze exclusive dealing cases

have been diverse. *Compare Standard Oil of California*, 337 U.S. at 314, 69 S.Ct. 1051 (holding that Clayton Act § 3 was violated whenever the exclusive dealing arrangement foreclosed a significant dollar volume of commerce), *with Tampa Elec. Co.*, 365 U.S. at 328–29, 81 S.Ct. 623 (holding that exclusive dealing arrangements violate § 3 when they significantly foreclose the opportunity for competing firms to enter the market). Regardless of how the case is analyzed, however, "the essential inquiry remains the same-whether or not the challenged action enhances competition." *National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). This inquiry is fully consistent with the text of the statute, which expressly prohibits combinations that "may ... substantially lessen competition...." 15 U.S.C. § 14.

Plaintiff's suggested reading of § 15.05(c), on the other hand, draws an arbitrary distinction without regard to the language or purpose of the statute. Plaintiff's reading of § 15.05(c), for instance, would enable competitors in oligopolistic markets to enter obviously harmful exclusive dealing arrangements without fear of § 15.05(c) liability so long as the arrangement was phrased in terms of excluding only one competitor as opposed to all competitors. The effects would be even more ridiculous on duopolistic markets.

Tellingly, Plaintiff has cited no precedent supporting its reading of § 15.05(c). Moreover, the court is aware of none. To the contrary, in *Transource Intern., Inc. v. Trinity Industries. Inc.*, the Fifth Circuit held that § 3 of the Clayton Act, and therefore § 15.05(c), "merely outlaws a contract for sale that restricts a lessee or purchaser from dealing in the goods of *a competitor* of the lessor or seller." 725

F.2d 274, 285 (5th Cir.1984) (emphasis added). Because both Clayton § 3 and TFEAA § 15.05(c) are designed to "promote competition with the seller," *id.*, the court finds it unlikely that the legislatures enacting these statutes actually intended to differentiate between agreements shielding the seller from competition from all competitors and agreements shielding the seller from competition with only a single competitor. Indeed, in many circumstances a single competitor may effectively comprise all of the competition. *See, e.g., Business Electronics Corp.*, 485 U.S. at 721.

A more reasonable reading of § 15.05(c) respects the plain language of the statute and focuses on the evil the statute was designed to prohibit, which is firms' use of vertical agreements to substantially lessen competition in any line of trade. Tex. Bus. & Com.Code § 15.05(c); *see also Tampa Elec. Co.*, 365 U.S. at 326–28, 81 S.Ct. 623. The court is therefore unconvinced by Plaintiff's unsupported argument and finds that § 15.05(c) does prohibit vertical sales agreements excluding even a single competitor of the seller from the market when such agreement substantially lessens competition.

In Plaintiff's next argument in favor of dismissal, Plaintiff argues that Defendants' counterclaim is factually insufficient because Defendants have failed to "include *at the very least* an identification in the pleadings of the alleged co-conspirators." Mot. to Dismiss Defs.' Counterclaim Pursuant to Rule 12(b)(6) & Br. in Supp. at 8. Plaintiff claims that an identification of co-conspirators is necessary to the successful pleading of exclusive dealing. *Id.* Plaintiff and Defendants have cited precedent on both sides of this argument, none of which is binding on this court.[4] This court will

---

**4.** Plaintiff has cited *Nine West Shoes Antitrust*    *Litigation*, 80 F.Supp.2d 181, 191 (S.D.N.Y.

follow the Fifth Circuit's recent discussion of this issue in *Apani Southwest, Inc.*, 300 F.3d at 633, which concludes that heightened pleading standards are not appropriate in antitrust cases, but antitrust claimants must nonetheless state facts sufficient to create an inference that the alleged violation actually occurred. Such a rule does not expressly require the complaint to include the names of specific co-conspirators, but certain other facts are necessary.

▇ In order to demonstrate that an exclusive dealing arrangement that violates § 15.05(c) has actually occurred, the Supreme Court has held that a claimant must demonstrate: (1) the relevant product market, (2) the relevant geographic market, and (3) that the competition foreclosed by the arrangement constitutes a substantial share of the relevant market. *Tampa Elec. Co.*, 365 U.S. at 327–28, 81 S.Ct. 623.

▇ First, Defendants must allege facts regarding the relevant product market. The Supreme Court has stated that the relevant product market, or "line of commerce," is "the type of goods, wares, or merchandise, etc., involved" and must be determined, when in dispute, "on the basis of the facts peculiar to the case." *Tampa Elec. Co.*, 365 U.S. at 327, 81 S.Ct. 623. When "ascertaining the relevant product market, courts consider the extent to which the seller's product is 'interchangeable in use' and the degree of 'cross-elasticity of demand between the product itself and substitutes for it.'" *Apani Southwest, Inc.*, 300 F.3d at 626 (quoting *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir.1985) (citations omitted)). In this case, for example, Defendants allege that the relevant product market is the market for discount cigarettes. Defs.' Ans. to Compl. & Counterclaim at 6. But Defendants have not made any allegations regarding the elasticity or inelasticity of demand for discount cigarettes vis-a-vis the demand for name brand cigarettes. Thus, the court has no evidence from which to infer that the relevant market is actually limited to discount cigarettes.

The court notes that other courts considering this question have found that there is "obviously high cross-elasticity of demand between branded and generic cigarettes,"

---

2000) (stating that "[t]he complaint 'must identify the co-conspirators, and describe the nature and effects of the alleged conspiracy' "); *Estate Construction Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 221 (4th Cir.1994) (stating that "in order to adequately allege an antitrust conspiracy, the pleader must 'provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken place' "); *Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1261 (11th Cir. 1998) (dismissing claim in which the plaintiff identified the defendant's co-conspirators "only as 'manufacturers and sellers of electric pool heat pumps,' and specifie[d] no fact in support of this allegation"); and *JM Computer Services, Inc. v. Schlumberger Technologies, Inc.*, 1996 WL 241607, at *3 (N.D.Ca.1996) (stating that the plaintiff's claim was insuffi-ciently pled because "Plaintiff has failed to identify the other participant(s) in the agreement or conspiracy which Plaintiff claims violates § 1").

In opposition, Defendants have cited *Hewlett–Packard Co. v. Arch Associates Corp.*, 908 F.Supp. 265, 269 (E.D.Pa.1995) (finding that the plaintiff had adequately pled concerted action by stating that "HP, in concert with certain members of its authorized distribution network, ... unlawfully conspired and combined in an effort to expand its monopoly and to further restrain trade"); and *American Health Sys. v. Crozer–Keystone Health Sys.*, 1993 WL 533102, 1995 U.S. Dist. LEXIS 18060 (E.D.Pa.1993) (finding that the plaintiff had sufficiently alleged concerted action despite only making a "vague reverence ... to 'various other persons, entities and corporations' who participated as co-conspirators").

meaning that consumers find branded and generic cigarettes fairly interchangeable. *See, e.g., Liggett Group v. Brown & Williamson Tobacco Corp.*, 748 F.Supp. 344, 362–363 (M.D.N.C.1990). When cross elasticity of demand is high, the reasonably interchangeable products are generally considered to constitute one market. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

But this court need not find definitively whether the relevant product market includes all cigarettes or only discount cigarettes, because the court finds that Defendants have failed to plead facts sufficient to support their definition of the relevant market in this dispute. The Fifth Circuit has recently held that

> [w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted.

*Apani Southwest, Inc.*, 300 F.3d at 628. Because Defendants' counterclaim fails to make any factual allegations to the effect that discount cigarettes and branded cigarettes are not interchangeable, Defendants have submitted an inadequate pleading.

This court is mindful, however, of the liberal pleading rules of federal courts, and the court will therefore look to whether Defendants have met their other obligations.

Second, Defendants must allege facts regarding the relevant geographic market. The Supreme Court has stated that the relevant geographic market, "must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co.*, 365 U.S. at 327, 81 S.Ct. 623. In this case, there are two possibilities regarding the geographic market. First, it is possible that the geographic market is limited to the state of Texas. This would be the case if the relevant line of commerce were the sale of discount cigarettes to retailers in Texas. This is so because Texas tax laws specify that before any cigarettes may be sold in Texas, they must first be stamped by an in-state distributor, indicating that the state taxes have been paid on those cigarettes. *See* TEX. TAX CODE ANN. § 154.001, *et seq.* (indicating that only distributors who are authorized by law may purchase cigarettes for the purpose of making the "first sale" of those cigarettes within the state). As a practical matter, therefore, Texas retailers may only purchase cigarettes that have been sold by in-state distributors. Under the *Tampa Electric Company* standard stated above, this would indicate that the relevant geographic market is the State of Texas. 365 U.S. at 327, 81 S.Ct. 623.

If the relevant product market were the sale of discount cigarettes to Texas distributors, however, the geographic market would have to be defined much more broadly. Though the court has insufficient evidence to define it with any precision, the court would have to assume that the market extends at least to Virginia, where Plaintiff Star manufactures the cigarettes that it sells in Texas. Compl., ¶ 1. If this is the case, it is likely that Texas cigarette distributors could purchase cigarettes from any number of states in which tobacco corporations manufacture cigarettes.

Defendants have not alleged facts sufficient to indicate whether the geographic market relevant to this dispute is limited to Texas or consists of something much

larger. Defendants have merely alleged that "[t]he purpose of DDM was to market a number of brands of cigarettes in Texas, including brands made by Star, for a profit." Defs.' Ans. to Compl. & Counterclaim at 5. Additionally, Defendants allege that they have "made efforts to organize and engage in business in Texas." *Id.* It is unclear from these allegations whether Defendants intended to enter the market as a manufacturer, a distributor, a wholesaler or a retailer.

Defendants' response to Plaintiff's complaint does contain some clues regarding Defendants' business plan. In their response, for example, Defendants admit that they at least discussed a plan to sell their own brand of cigarettes, Tracker. *Id.,* at 3. If Defendants were planning on marketing their own brand of cigarettes, these would certainly have to be sold to Texas distributors if they were to be sold in-state. TEX. TAX CODE ANN. § 154.022. As such, the geographic market for at least a portion of Defendants' business would likely be much more broad than the State of Texas itself. Once again, however, the court is forced into speculation regarding market definition because Defendants have not pled facts sufficient to define the geographic market relevant to this dispute.

Finally, Defendants' have alleged that "one of the intended effects of Star's scheme is to lessen competition in the discount cigarette business in the State of Texas," but have failed to allege that the competition foreclosed by Plaintiff's alleged agreements constitutes a substantial share of the relevant market, which is necessary under the Supreme Court's three-part test in *Tampa Electric Company,* 365 U.S. at 328, 81 S.Ct. 623. Indeed, as noted above, Defendants failed to define the relevant market, so any allegation regarding the share of that market that had

been foreclosed could have been nothing more than conclusory.

For these reasons, Defendants have failed to allege facts sufficient to support their exclusive dealing counterclaim under § 15.05(c). Where a claimant fails to adequately state an exclusive dealing claim under § 15.05(c), he has also failed to failed to state a claim under § 15.05(a). *Cf. Tampa Elec. Co.,* 365 U.S. at 335, 81 S.Ct. 623. Plaintiff's motion is therefore GRANTED with respect to §§ 15.05(a) & (c), and Defendants' exclusive dealing claim is DISMISSED.

### 2. Defendants' Attempted Monopolization Claim

In addition to exclusive dealing, Defendants have alleged that Plaintiff has conspired to "monopolize or attempt to monopolize trade or commerce in the discount cigarette business." Defs.' Ans. to Compl. & Counterclaim at 6. In order to prevail on an attempted monopolization claim under § 15.05(b), Defendants must prove that Plaintiff acted with a specific intent to monopolize and that Plaintiff's actions create a dangerous probability that Plaintiff would actually monopolize the relevant market. *Spectrum Sports, Inc., v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Generally, these requirements are stated in the form of a three-prong test. A claimant asserting an attempted monopolization claim must demonstrate: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Id.,* at 456, 113 S.Ct. 884; *see also Surgical Care Center of Hammond, L.C. v. Hospital Service of Dist. No. 1 of Tangipahoa Parish,* 309 F.3d 836, 839 (5th Cir.2002). Generally, in order to find a "dangerous probability of achieving monopoly power," courts find it

necessary to consider the relevant market. *Spectrum Sports, Inc.,* 506 U.S. at 456, 113 S.Ct. 884. The Fifth Circuit has combined these analyses, such that the second prong requires the claimant to prove a "specific intent to monopolize the relevant market." *Surgical Care Center of Hammond, L.C.,* 309 F.3d at 839. Either way, in order to determine whether monopoly is possible, it is necessary to define the relevant market.

The court has noted that Defendants counterclaim fails to include key factual allegations regarding the composition of the relevant geographic and product markets. *Apani Southwest, Inc.,* 300 F.3d at 624 (citing *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995) for the proposition that "dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief"). Defendants' attempted monopolization claim is therefore DISMISSED.

### B. *Defendants' Tortious Interference Counterclaim*

█ Defendants' counterclaim also alleges that Plaintiff has tortiously interfered with Defendants' prospective business relations. Regarding this tort, the Texas Court of Appeals has stated:

· [t]o prevail on a claim of tortious interference with prospective business relations, the plaintiff is required to establish: (1) a reasonable probability the plaintiff would have entered a contractual relationship with a third-party; (2) an intentional and malicious act that intervened with the formation of that relationship; (3) the defendants lacked privilege or justification to interfere; and (4) actual damage, loss, or harm resulted from the defendant's interference.

*Richter v. Wagner Oil Co.,* 90 S.W.3d 890, 897 (Tex.App.-San Antonio 2002, no pet.) (citing *Milam v. National Ins. Crime Bureau,* 989 S.W.2d 126, 131 (Tex.App.-San Antonio 1999, no pet.)). The Texas Supreme Court held that "to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713 (Tex.2001). "Independently tortious" means that the conduct objected to would violate "some other recognized tort duty." *Id.*

█ In this case, Defendants complain that Plaintiff has interfered with its business relation in three separate ways. First, Defendants allege that Plaintiff boycotted any business that agreed to do business with Defendants. Defs.' Ans. to Compl. & Counterclaim at 6. While this may amount to an antitrust violation, Defendants have not pled facts sufficient to allow the court to infer that it rises to the level of a tort. In fact, the Texas Court of Appeals has stated, "[a] party may refuse to deal with third persons in the business in which the parties compete because the third persons deal with the competitor; however, a party may not do so in order to establish or maintain an illegal monopoly." *Caller-Times Pub. Co. v. Triad Comm., Inc.,* 855 S.W.2d 18, 22 (Tex.App.-Corpus Christi 1993, no writ). For the reasons stated above, Defendants have failed to adequately plead an antitrust violation in their counterclaim. Plaintiff's alleged boycott, therefore, cannot form the independent tort basis for this claim.

█ Second, Defendants allege that Plaintiff spread "false rumors that [Defendant] Lind was being sued by his former employer, A.B. Coker . . . ." Defs.' Ans. to Compl. & Counterclaim at 6. Plaintiff claims that Defendants' allegation regarding these rumors constitutes an allegation of fraud, which must be pleaded with particularity under Rule 9(b) of the Federal

Rules of Evidence. Mot. to Dismiss Defs.' Counterclaim Pursuant to 12(b)(6) & Br. in Supp. at 15. This is a mischaracterization of Defendants' counterclaim.

In Texas, the elements of common law fraud are that: "(1) a material representation was made; (2) it was false when made; (3) the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker intended that it be acted upon by the party; (5) the party acted in reliance; and (6) the party thereby suffered injury." *Eagle Props. Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990). In this case, it is not Defendants' allegation that Plaintiff intended Defendant to act in reliance on the allegedly false statement. Rather, Defendants contend that it was Plaintiff's intention that third-party businesses would act in reliance on Plaintiff's allegedly false statement. Defendants, therefore, would not have alleged fraud, but rather slander.

In Texas, slander is "a false oral statement that is published to a third person without a legal excuse, which refers to an ascertainable person." *Austin v. Inet Technologies, Inc.*, 118 S.W.3d 491, 496 (Tex.App.-Dallas 2003, no writ). The "statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury." *Id.* The "[d]efamatory statements are 'published' if they are communicated orally, in writing, or in print to some third person capable of understanding their defamatory import and in such a way that the third person did so understand."

In this case, Defendants allege that Plaintiff spread false rumors to Defendants' potential clients with the intent of "killing" Defendants' business. Defs.' Ans. to Compl. & Counterclaim at 5. Defendants allege that these rumors were spread intentionally, maliciously and with the intent of harming Defendants' business. *Id.*, at 6. Moreover, Defendants claim that Plaintiff's actions caused Defendants to sustain damages "in excess of $75,000." Defs.' Ans. to Compl. & Counterclaim at 6. Thus, Defendants have successfully alleged that slanderous comments were made.

Texas law recognizes several privileges and justifications, which shield a speaker from liability for comments that would otherwise be slanderous, but none of them are applicable to this case. *See, e.g., Gustafson v. City of Austin*, 110 S.W.3d 652, 656 (Tex.App.-Austin 2003, pet. struk) (holding that truthfulness is an absolute defense to slander); *Jenevein v. Friedman*, 114 S.W.3d 743, 746 (Tex.App.-Dallas 2003, no writ) (holding that statements made in the course of a judicial proceeding are privileged); *East. Texas Med. Ctr. Cancer Inst. v. Anderson*, 991 S.W.2d 55, 60 (Tex.App.-Tyler 1998, pet. denied) (holding that a qualified privilege exists when the statement is made "in good faith on any subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty" unless the statement is made with malice); *Patrick v. McGowan*, 104 S.W.3d 219, 224 (Tex.App.-Texarkana 2003, no pet.) (holding that statements made by a former employer to a prospective employer regarding the work performance of a former employee are subject to a qualified privilege).

Third and finally, Defendants allege that Plaintiff tore down "pole signs belonging to DDM...." Defs.' Ans. to Compl. & Counterclaim at 5. Defendants have not clarified, however, what a "pole sign" is and why the Plaintiff would have a legal duty not to tear one down. The court need not muse further about these questions, however, because the tort of slander has been adequately pled, satisfying the

standard set in *Wal–Mart Stores*. The court may therefore proceed with the four-prong test outlined in *Richter v. Wagner Oil Co.*, 90 S.W.3d at 897.

First, Defendants must allege that there was a "reasonable probability" that they "would have entered a contractual relationship with a third-party." *Id.* In their counterclaim, Defendants claim to have had a "reasonable expectation of making profits in their new business . . . ." Defs.' Ans. to Compl. & Counterclaim at 5. Defendants do not state specifically that they were poised to enter any specific contractual relationship, but such a claim is not necessary. The court can reasonably infer that some contractual relationship was at least reasonably probable if Defendants had reasonable expectations of making a profit in their new business. Regardless, given the Supreme Court's statement in *Leatherman* that "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim," the court believes that Defendants' counterclaim fairly appraises Plaintiff of the nature of the claim "and the grounds upon which it rests." 507 U.S. at 168, 113 S.Ct. 1160. Further, it does not appear "beyond doubt" that Defendants can prove "no set of facts in support of [their] claim which would entitle [them] to relief." *Bauer*, 341 F.3d at 356.

Second, Defendants must demonstrate "an intentional and malicious act that intervened with the formation of that relationship." *Richter*, 90 S.W.3d at 897. Defendants have stated the slander claim discussed above.

Third, Defendants are traditionally required to demonstrate that Plaintiff "lacked privilege or justification to interfere." *Richter*, 90 S.W.3d at 897. This requirement, however, is "[s]ubsumed in the [claimant's] proof, except insofar as

they may be defenses to the wrongfulness of the alleged conduct." *Wal–Mart Stores*, 52 S.W.3d at 726–27. In other words, "[j]ustification and privilege are defenses in a claim for tortious interference with prospective business relations only to the extent that they are defenses to the independent tortiousness of the defendant's conduct." *Id.*, at 727. If there is no justification or privilege that would excuse the tortfeasing party from liability for the independent tort, the claimant has met his burden on this prong. *Id.* As noted above, the court has found no privilege or justification shielding Plaintiff from liability for the alleged tort.

Finally, Defendants must allege "actual damage, loss, or harm resulted from the defendant's interference." *Richter*, 90 S.W.3d at 897. In this case, Defendant has alleged losses in excess of $75,000.00. Defs.' Ans. to Compl. & Counterclaim at 6.

For the reasons discussed above, Defendants have adequately pled the elements of tortious interference with prospective business relations. Plaintiff's motion to dismiss Defendants' counterclaim for tortious interference with prospective business relations is therefore DENIED.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's motion to dismiss Defendants' counterclaim is therefore GRANTED in part and DENIED in part.

It is so ORDERED.