# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 6, 2023

Lyle W. Cayce
Clerk

No. 22-30091
CONSOLIDATED WITH
No. 22-30559

New Orleans Association of Cemetery Tour Guides and Companies,

*Plaintiff—Appellant*,

*versus*

New Orleans Archdiocesan Cemeteries, *doing business as* New Orleans Catholic Cemeteries; Cemetery Tours NOLA, L.L.C.,

*Defendants—Appellees*.

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-2051

Before King, Stewart, and Haynes, *Circuit Judges*.

King, *Circuit Judge*:

Plaintiff-Appellant ACTGC brought federal antitrust and various state law claims in a suit concerning tours of two New Orleans cemeteries. ACTGC also requested injunctive relief, which the district court denied and ACTGC first appealed. The district court then dismissed ACTGC's federal antitrust and state law claims, which ACTGC also appealed. Defendant-

No. 22-30091 c/w No. 22-30559

Appellee NOAC then moved to dismiss the first appeal as moot. We GRANT NOAC's motion, DISMISS the first appeal, and AFFIRM the judgment of the district court on all issues in the second appeal.

## I.

### A. Factual Background

The St. Louis No. 1 and No. 2 ("No. 1" and "No. 2," respectively) cemeteries near New Orleans's French Quarter attract numerous visitors and guided cemetery tours. Plaintiff-Appellant Association of Cemetery Tour Guides and Companies L3C d.b.a. New Orleans Association of Cemetery Tour Guides and Companies ("ACTGC") is a low-profit limited liability company comprised of tour companies and guides offering cemetery tours in the New Orleans area.[1] Defendant-Appellee New Orleans Archdiocesan Cemeteries d.b.a. New Orleans Catholic Cemeteries ("NOAC") is a cemetery authority that operates New Orleans-area cemeteries, including Nos. 1 and 2. Defendant-Appellee Cemetery Tours NOLA LLC ("CTN") is a tour company.[2]

The operative complaint[3] alleges the following facts. In 2015, NOAC closed No. 1 to all visitors except family members of the interred and visitors willing to pay a fee. Companies wishing to conduct tours also had to make payments to NOAC. In 2020, with the onset of the COVID-19 pandemic, NOAC closed Nos. 1 and 2 to everyone except the immediate family of the

---

[1] The original plaintiff in the underlying action was Witches Brew Tours LLC. From the first amended complaint onwards, Witches Brew Tours LLC was replaced by ACTGC, which was formed after the filing of the original complaint.

[2] For brevity, the two Defendants-Appellees are collectively referred to as NOAC throughout.

[3] This is the second amended complaint filed on February 11, 2022.

interred. As of November 2021, the cemeteries remained closed, but ACTGC represented that No. 1 was subsequently opened for tours. At some point, NOAC awarded a contract to CTN to manage tours in No. 1 under terms dictated by NOAC. Although it is unclear whether CTN is currently conducting these tours, these terms state that:

> (1) all tour narratives and routes must be approved by NOAC; (2) only tour guides from CTN are allowed to conduct tours; (3) local company tour guides may escort tour groups, but may not offer commentary; and (4) prices will be fixed at $25.00 for adults and $18.00 for tour wholesalers.

## B. Procedural Background

The underlying dispute in this case generated two separate appeals. The first appeal was calendared in this court as No. 22-30091 (the "First Appeal") and the second as No. 22-30559 (the "Second Appeal"). These appeals were later consolidated. This section proceeds in four stages summarizing events in (1) the district court before the First Appeal; (2) the First Appeal; (3) the district court after the First Appeal; and (4) the Second Appeal.

### 1. The Underlying District Court Case (Before the First Appeal)

On November 5, 2021, Witches Brew Tours LLC ("Witches Brew") filed a complaint against NOAC and CTN seeking, *inter alia*, a temporary restraining order and a preliminary injunction. This complaint asserted five theories of liability under federal antitrust acts, Louisiana competition law, and Louisiana property law; these counts generally alleged that the NOAC-CTN business plan violates antitrust law and impermissibly excludes ACTGC's members from visiting or providing their tour services at Nos. 1

and 2.[4] On November 8, 2021, the district court denied the temporary restraining order on the grounds that Witches Brew had not sufficiently established irreparable harm.

Plaintiff-Appellant ACTGC—having replaced Witches Brew as the plaintiff—then filed its first amended complaint containing primarily the same theories of liability as the original complaint. ACTGC also filed an amended motion for a preliminary injunction. In its first amended memorandum in support of a preliminary injunction, ACTGC requested injunctive relief because Defendants were "violating the public's right to free and reasonable access to public cemeteries" and because ACTGC's members would risk losing large portions of their business income during the closure of No. 1.

NOAC responded with two motions. First, NOAC filed a motion to dismiss under Rule 12(b)(1), arguing that the district court lacked subject matter jurisdiction because ACTGC lacked standing and because the Sherman and Clayton Acts were inapplicable for lack of the required nexus to interstate commerce. Second, NOAC filed a brief in opposition to ACTGC's motion for a preliminary injunction. In this brief, NOAC principally argued that ACTGC could not show a likelihood of success on the

---

[4] Specifically, the five asserted theories of liability were (1) unlawful price fixing in violation of 15 U.S.C. § 1 (the Sherman Act); (2) monopolization by means of unlawful market allocation or exclusion of competition, in violation of 15 U.S.C. § 2 (the Sherman Act); (3) unlawful restraint of trade, in violation of LA. STAT. ANN. § 51:122; (4) unfair and unreasonable monopoly, in violation of LA. STAT. ANN. § 51:123; and (5) unlawful exclusion of extended relatives and friends from religious cemeteries. ACTGC claims elsewhere in this complaint that "[t]his is an action under Sections 1 and 2 of the Sherman Act and Clayton Act," but the claims do not specifically identify the relevant sections of the Clayton Act.

merits because, as relevant here, ACTGC mischaracterized the test for adjudicating the Sherman and Clayton Act claims.

On January 27, 2022, the district court issued a ruling on ACTGC's motion for a preliminary injunction and NOAC's motion to dismiss. The district court denied the preliminary injunction because ACTGC failed to show any evidence of irreparable harm and granted NOAC's motion to dismiss because ACTGC had not shown the requisite nexus to interstate commerce required to successfully allege a claim under the Sherman Act. The district court then granted ACTGC leave to file another amended complaint to cure its pleading deficiencies. ACTGC did so and filed the operative second amended complaint on February 11, 2022. ACTGC then moved to appeal the denial of the preliminary injunction. This created the First Appeal. During the pendency of the First Appeal, the district court proceedings continued in parallel.

## 2. The First Appeal

The First Appeal is an interlocutory appeal of the district court's denial of a preliminary injunction. Both issues on appeal concern whether the district court properly denied ACTGC injunctive relief; namely, whether the district court (1) abused its discretion in holding that ACTGC failed to establish irreparable harm and (2) otherwise erred in denying ACTGC injunctive relief.

## 3. The Underlying District Court Case (After the First Appeal)

In district court, the parties continued to litigate the claims in the second amended complaint.[5] In March, NOAC and CTN filed substantively-

---

[5] Although the district court and NOAC reference ACTGC's Clayton Act claims at various stages of the litigation, ACTGC ceased pursuing such claims in the operative second amended complaint, which does not reference the Clayton Act.

identical Rule 12(b)(6) motions to dismiss. In support, NOAC argued that ACTGC had not stated a claim under the federal antitrust laws because it had failed to define the "relevant market" as required to state a claim under the Sherman and Clayton Acts.[6] NOAC argued that ACTGC had too narrowly defined both components of the relevant market, *i.e.*, the product market and the geographic market. Assuming *arguendo* that ACTGC had properly characterized the relevant market, NOAC argued in the alternative that the NOAC-CTN agreement was not an unreasonable restraint on trade.[7] In response, ACTGC argued it had appropriately defined the relevant market and adequately pleaded an unreasonable restraint on trade.

In May, some six months after Witches Brew filed the initial complaint, ACTGC moved to amend the second amended complaint to add six affidavits from the interim manager of ACTGC and five tour guides. These affidavits primarily discuss the economic and emotional consequences faced by these tour guides. NOAC opposed this motion, arguing that adding the affidavits would be futile as related to the Sherman Act claims and that the affidavits failed to establish non-monetary harm.

In June, a magistrate judge denied ACTGC's motion to amend its complaint to add these affidavits. ACTGC moved for review of this order by the district court. In August, the district court denied ACTGC's motion and affirmed the magistrate judge's decision. The district court found that ACTGC acted with "undue delay in seeking to attach this evidence [*i.e.*, the

---

[6] NOAC also argued that the state competition law claims should fail for the same reasons, as the state statutes track "almost verbatim" the language of the Sherman and Clayton Acts and Louisiana courts have thus used federal antitrust jurisprudence to analyze the Louisiana state laws.

[7] On the state property law claims, NOAC argued that Nos. 1 and 2 are not public property and that ACTGC had no possessory interest in the cemeteries. ACTGC argued in response that the cemeteries were dedicated for public use.

affidavits] to the active complaint" by attempting to amend six months after the initial complaint. It also noted that ACTGC had failed to show irreparable harm at the preliminary injunction evidentiary hearing and that "manifest prejudice would result to Defendants if the proposed 'amendment' were allowed." Finally, the district court held that allowing the proposed amendment would be futile, as nothing in the affidavits cured the lack of irreparable harm or supported ACTGC's antitrust and possessory claims.

In August, the district court granted NOAC's and CTN's 12(b)(6) motions to dismiss because ACTGC's "failure to plead a legally sufficient definition of either the product market or the geographic market warrants dismissal of its antitrust claims."[8] ACTGC appealed, creating the Second Appeal.

### 4. The Second Appeal

ACTGC raises two issues in the Second Appeal. First, it argues that the district court abused its discretion in denying ACTGC's motion for review of the magistrate judge's order denying ACTGC's motion to add six affidavits to its complaint. Second, it argues that ACTGC's second amended complaint stated a claim for relief from a monopolistic price-fixing scheme.

After the Second Appeal was calendared, NOAC filed a motion to dismiss the First Appeal. In this motion, NOAC argues that this panel should dismiss the entirety of the First Appeal for lack of jurisdiction. Specifically, NOAC asserts that the First Appeal is moot because, as relevant, the complaint underlying ACTGC's request for a preliminary injunction in that

---

[8] The district court declined to exercise supplementary jurisdiction over the remaining state law claims.

appeal was superseded by a subsequently amended complaint. We carried this motion with the case and consolidated the First and Second Appeals.

## II.

First, we consider the outstanding motion to dismiss the First Appeal for lack of jurisdiction as moot. Mootness is related to the constitutional prohibition against exercising jurisdiction absent a case or controversy. U.S. Const. art. III, § 2, cl. 1. Federal courts are "without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam). Because a moot case does not affect the rights of its litigants, *i.e.*, there is no case or controversy, it is beyond the purview of a federal court to decide. *Id.* "Events both before and after the filing of a claim may render a claimant's case moot." *Baccus v. Parrish*, 45 F.3d 958, 961 (5th Cir. 1995).

In its motion, NOAC argues that the First Appeal is moot because the underlying complaint in that appeal has been superseded by the second amended complaint. NOAC argues that the district court's preliminary injunction analysis was predicated on ACTGC's first amended complaint; consequently, any opinion ruling on the correctness of this analysis would be relevant only to a complaint that is no longer operative and thus purely advisory.

We agree with NOAC. The first amended complaint is a legal nullity because it was not incorporated by the subsequent second amended complaint. "An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam). And incorporation by reference must be "with a degree of specificity and clarity which would enable the responding party to easily determine the nature and extent of the

8

incorporation." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1176 (5th Cir. 2006). The operative second amended complaint does not even mention, much less successfully incorporate, the first amended complaint.[9] ACTGC thus failed to incorporate the first amended complaint, and this prior complaint has no legal effect. *King*, 31 F.3d at 346.

Because the first amended complaint is nullified, we cannot consider—and thus must dismiss—an appeal of a denial of injunctive relief stemming from said complaint. *See Tripathy v. McClowski*, 2022 WL 2069228, at *2 (2d Cir. June 9, 2022) (amendment "rendered [Plaintiff's] original complaint inoperative and his appeal of the district court's denial of a preliminary injunction that he requested in the original complaint moot"); *Falck N. Cal. Corp. v. Scott Griffith Collaborative Sols., LLC*, 25 F.4th 763, 766 (9th Cir. 2022) (dismissing as moot an appeal premised on a superseded complaint).

ACTGC's arguments to the contrary lack merit. This court's precedents make clear that failure to adopt or incorporate by reference a prior complaint nullifies that document. *See, e.g.*, *King*, 31 F.3d at 346. ACTGC argues that we can hear the First Appeal because the nullified and amended complaints are sufficiently similar, but this argument does not address ACTGC's failure to incorporate by reference the earlier complaint. *See Falck*, 25 F.4th at 766 (stating that "the complaint challenged on appeal is a legal nullity even if much like the operative complaint"). This failure nullified the first amended complaint as a matter of law. To hear an appeal on a nullified, legally inoperative document is to impermissibly adjudicate a moot case, *i.e.*, one where "the parties do not have a legally cognizable

---

[9] The only incorporations of other documents present in the second amended complaint are in the discussions of standing, but these incorporations reference a response filed in opposition to a motion to dismiss, not the original complaint.

interest in the outcome." *Baccus*, 45 F.3d at 961. Accordingly, we grant NOAC's outstanding motion to dismiss the First Appeal for lack of jurisdiction and dismiss the First Appeal.

## III.

Next, we consider the issues in the Second Appeal. We begin with the denial of ACTGC's motion to amend its complaint to add the affidavits. This court reviews a denial of a motion for leave to amend a complaint for abuse of discretion. *Parish v. Frazier*, 195 F.3d 761, 763 (5th Cir. 1999). Decisions concerning motions to amend are "entrusted to the sound discretion of the district court." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (quoting *Quintanilla v. Tex. Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998)). "The district court properly exercises its discretion . . . when it denies leave to amend for a substantial reason." *U.S. ex rel. Spicer v. Westbrook*, 751 F.3d 354, 367 (5th Cir. 2014). This court "examines five considerations to determine whether to grant a party leave to amend a complaint: 1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Smith*, 393 F.3d at 595. The existence of one of these factors is sufficient to deny leave. *See id.* ("Absent any of these factors, the leave sought should be 'freely given.'" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))).

The district court properly denied ACTGC's motion to amend because any such amendment would be futile for two reasons. First, the district court correctly noted that amendment would "be futile because [the affidavits] 'add nothing to the case,' 'do not specify injuries that cannot be remediated by money damages,' and 'fail to allege that the affiants are unable to offer tours of [Nos. 1 and 2].'" ACTGC argues that affiant Christie Tomlinson's affidavit shows she had to close her business and was deprived

No. 22-30091 c/w No. 22-30559

of her ability to visit various gravesites. But, as correctly noted by the district court, these facts specify injuries that are remediable through monetary damages.

Second, the district court correctly noted that the affidavits add nothing to support ACTGC's antitrust or possessory claims. ACTGC does not address this argument in its briefing, which focuses exclusively on how the affidavits allegedly establish irreparable harm. As such, this argument is forfeited. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).[10]

In sum, the district court did not abuse its discretion in denying ACTGC leave to amend its complaint to add affidavits that do not add additional evidence of irreparable harm and do not address the pleading deficiencies of its federal law claims.

## IV.

Finally, we consider whether ACTGC failed to state a claim for relief from a monopolistic price-fixing scheme under the Sherman Act. We review a grant of a Rule 12(b)(6) motion *de novo. Huynh v. Walmart Inc.*, 30 F.4th 448, 453 (5th Cir. 2022). To survive such a motion, a complaint must allege enough facts that, when accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

---

[10] ACTGC's additional arguments to the contrary are unavailing. Although it argues that "the Affidavits were ignored" and that the district court's findings were "demonstrably false," these statements lack support in the record and in the briefing. ACTGC's arguments that the district court "ignored" facts in the complaint at an "unnecessary evidentiary hearing" are similarly unsupported and, more to the point, do not provide any reason for why the district court erred in denying the addition of affidavits to the complaint.

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, the complaint must include "factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

ACTGC fails to state a claim for relief because it does not define a legally sufficient relevant market as required by both sections 1 and 2 of the Sherman Act.[11] ACTGC argues it does not need to meet this requirement because the restraint in question is a horizontal agreement; as such, ACTGC argues, the NOAC-CTN agreement is presumptively illegal under the *per se* rule. ACTGC is incorrect. Horizontal agreements are price-fixing agreements between competitors. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Vertical agreements are those between entities at different levels of distribution. *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 849 (5th Cir. 2015) ("[A] distinction exists between agreements that are made between competitors (horizontal agreements) and agreements between manufacturers and customers (vertical agreements)."). Antitrust law is generally more skeptical of horizontal agreements and restraints. *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348 n.18 (1982) (noting that "horizontal restraints are generally less defensible than vertical restraints"); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886

---

[11] A claim for violation of section 1 of the Sherman Act requires ACTGC to show, *inter alia*, that "trade was restrained in the relevant market." *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010). The "first step in this analysis is determining the relevant market." *Id.* To state a claim for violation of section 2, ACTGC must similarly show, *inter alia*, "the possession of monopoly power in the relevant market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

(2007) (stating that horizontal agreements are *per se* illegal); *id.* at 907 (holding that vertical agreements are not *per se* illegal).

The NOAC-CTN agreement at issue is a vertical agreement because NOAC is a cemetery authority, and CTN is a cemetery tour provider. They do not directly compete in the market for cemetery tours because, of the two parties, only CTN is in the business of providing tour services (*i.e.*, the product). Because NOAC and CTN operate at different levels of the provision of cemetery tour services, their agreement for CTN to exclusively provide tours is a vertical agreement. *See* 8 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1600, at 3 (4th ed. 2017) ("Separate firms operating at different levels of production are said to have 'vertical' dealings with each other.").[12]

Thus, because the restriction in question is a vertical agreement, alleging a violation of the relevant sections of the Sherman Act requires ACTGC to define a "relevant market."[13] *Shah v. VHS San Antonio Partners,*

---

[12] ACTGC argues that NOAC and CTN are in a horizontal price-fixing relationship because they are business partners. This argument misses the mark because it incorrectly assumes, without justification or reasoning, that business partners are competitors. ACTGC does not cite any legal authority indicating that an agreement between NOAC and CTN as business *partners* necessarily should be characterized as a horizontal restraint between *competitors*. ACTGC's arguments are unsupported in antitrust jurisprudence. Many business agreements are agreements between business partners, and many of those agreements (*e.g.*, sales contracts) state a particular price for goods or services. Characterizing any such agreement between two business partners as a price-fixing horizontal agreement between two competitors, then, incorrectly conflates business partners with competitors and could expand antitrust law to cover routine business arrangements.

[13] ACTGC also argues that this market definition requirement does not apply when there is "direct evidence of likely or actual effects on prices or output." The single case ACTGC cites for this proposition is *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986). ACTGC's argument is unavailing for two reasons. First, *Indiana Federation of Dentists* involved a horizontal agreement, not the vertical agreement at issue here. *See* 476 U.S. at 459 (stating that the relevant "policy takes the form of a horizontal agreement").

No. 22-30091 c/w No. 22-30559

*L.L.C.*, 985 F.3d 450, 453–54 (5th Cir. 2021); *Apani Sw., Inc. v. Coca–Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002); *accord Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120 (10th Cir. 2008) (failure to allege a relevant market requires dismissal when the two cooperating parties are not competitors). The two components of the relevant market are (1) the product market and (2) the geographic market. *Shah*, 985 F.3d at 454. A legally cognizable product market must "include all 'commodities reasonably interchangeable by consumers for the same purposes,'" *id* (quoting *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010)), and consider "interchangeability and cross-elasticity of demand," *Apani*, 300 F.3d at 625. A district court can dismiss Sherman Act claims for failure to properly define the relevant market. *Id.* at 628.

We hold that ACTGC has failed to plead a legally sufficient product market. Because the product market is a necessary component of the relevant market, ACTGC's failure to plead a legally sufficient product market means that we do not need to analyze its proffered geographic market. *See Shah*, 985 F.3d at 454 (the product market is a required component of the relevant market); *Apani*, 300 F.3d at 628 (failure to properly define the relevant market is grounds for dismissal); *cf. Surgical Care Ctr. of Hammond*, 309 F.3d at 840 (affirming the dismissal of antitrust claims for failure to properly

---

Indeed, this court has been skeptical of applying *Indiana Federation of Dentists* to cases involving vertical agreements. *See Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002) (rejecting plaintiff's similar argument because plaintiff did not show that *Indiana Federation of Dentists* is applicable to vertical restraints). ACTGC does not provide any reasoning as to why we should extend *Indiana Federation of Dentists* to vertical restraints. Second, subsequent Supreme Court precedent has clarified that even when parties present direct evidence of anticompetitive effects, a market definition inquiry is necessary. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284–85 (2018) ("Here, the plaintiffs rely exclusively on direct evidence to prove . . . anticompetitive effects in the credit-card market. To assess this evidence, we must first define the relevant market.").

define a geographic market). Nevertheless, we will assume *arguendo* that ACTGC has correctly pleaded the geographic market as New Orleans, as such an assumption makes our product market discussion more concrete.

ACTGC's pleadings are somewhat ambiguous as to which product we should use to define the product market. In some places, it states that the "cemetery tour industry" is the product market. But most of ACTGC's arguments in the complaint, motions, and briefing concern only tours of Nos. 1 and 2, *i.e.*, not the entire cemetery tour market; for example, it argues that Nos. 1 and 2 are unique in their historical and cultural significance compared to other cemeteries. Such language could be read as ACTGC's arguing that cemetery tours of Nos. 1 and 2 are the relevant product for purposes of relevant market definition. Nevertheless, because both of ACTGC's possible product market definitions fail as a matter of law, we need not and do not decipher which product market definition ACTGC has pleaded. Instead, we analyze the failings of each possible definition in turn.

First, a product market consisting of cemetery tours fails because ACTGC has not defined the product market to include interchangeable substitutes. In *Shah*, an organization of anesthesiologists signed an agreement to exclusively provide anesthesiology services in a local hospital system. 985 F.3d at 452–53. The organization then terminated its relationship with the plaintiff (a pediatric anesthesiologist), who was then barred from practicing within the local hospital system. *Id.* at 453. Despite the plaintiff's attempts to define the product market as "pediatric anesthesiologists," this court held that this definition did not encompass all interchangeable substitutes, in part because the plaintiff did not "attempt to identify . . . 'where people could practicably go' for pediatric anesthesia services within [the geographic market] . . . . [The plaintiff] did not even specify individual pediatric anesthesiologists from whom patients could practicably obtain health care

services." *Id.* at 455. The court then ruled that this market definition was insufficient as a matter of law. *Id.*

Applying *Shah*, ACTGC's "cemetery tours" product market is similarly insufficiently pleaded because it fails to identify reasonable substitutes within the proffered New Orleans geographic area. ACTGC's primary argument concerning the cemetery tours product market is that nothing is interchangeable with a cemetery and that "cemeteries are distinctive socially and legally" for, among other reasons, "their historical, spiritual, religious, architectural, or genealogical value." But ACTGC misunderstands the relevant inquiry. The product at issue is cemetery tours, not cemeteries generally. Thus, interchangeability for purposes of the market definition analysis requires us to consider whether there are reasonable substitutes for cemetery *tours*.

Such reasonable substitutes exist. Accordingly, a product market limited to cemetery tours alone does not rise to the level of plausibility required to survive a motion to dismiss. *See Twombly*, 550 U.S. at 570. Even accepting *arguendo* that cemeteries are special places, tourists take cemetery tours for different reasons than the reasons they might have for visiting cemeteries more generally. Namely, cemetery tour participants are often interested in the broader history and culture of New Orleans and its many other historical sites. Such a conclusion can be drawn from ACTGC's own filings noting that, prior to No. 1's closure, some of its members offered a "combined tour of the French Quarter, Voodoo sites, and No. 1." The existence of such combined tours indicates that many would-be cemetery tourgoers are also interested in tours of other historical areas. This suggests that other New Orleans historical site tours are reasonably interchangeable substitutes for cemetery tours. ACTGC's failure to include these substitutes in its product market definition thus makes its proffered product market unduly narrow and legally insufficient.

No. 22-30091 c/w No. 22-30559

Second, ACTGC fares no better in pleading a product market of cemetery tours of Nos. 1 and 2. At the outset, ACTGC faces the same issue dooming a "cemetery tours" product market because it fails to include any interchangeable substitutes to Nos. 1 and 2 within this product market. *See Shah*, 985 F.3d at 455. As previously noted, instead of defining the product market to include reasonably interchangeable substitutes (*e.g.*, other cemeteries in New Orleans), ACTGC instead implies that tours of Nos. 1 and 2 are the product market because these cemeteries have such unique significance that no substitutes exist.

Even assuming *arguendo* that this proffered product market includes all interchangeable substitutes, our precedent clearly precludes ACTGC's attempt to define such a narrow product market. In *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984), this court considered an antitrust claim brought by the Superdome Hotel, a Holiday Inn franchisee, against Holiday Inns. *See id.* at 483. After Holiday Inns incorporated another nearby hotel as a Holiday Inn, the Superdome Hotel brought an antitrust claim. *Id.* at 483–84. This court rejected a product market defined as Holiday Inn hotel rooms in New Orleans. *Id.* at 488. Instead, this court held that the proper market was hotel rooms in New Orleans more generally. *Id.* at 489. In doing so, the court noted that "one brand in a market of competing brands cannot constitute a relevant product market" and that "[t]he fact that a company limits its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market." *Id.* at 488 (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978)).

The situation here is analogous. ACTGC acknowledges that New Orleans contains other cemeteries and other cemetery tours. Similarly, the two Holiday Inn hotels in New Orleans were only part of a larger hotel room market. *See Domed Stadium Hotel*, 732 F.2d at 483–84 (identifying two

company-owned Holiday Inn hotels that together gave Holiday Inns only four percent of the New Orleans hotel room market). Accordingly, much like the *Domed Stadium Hotel* product market could not definitionally include only Holiday Inn hotel rooms, ACTGC's product market cannot consist only of cemetery tours of two cemeteries. In arguing to the contrary, ACTGC misunderstands the nature of the product market inquiry. ACTGC consistently emphasizes how much of the relevant (cemetery tour) market Nos. 1 and 2 make up. But such a fact, even when taken as true, answers a different question, namely how *much* of the market the putative monopolist holds. This market share inquiry is an analytically separate inquiry from the relevant market definition. *See id.* at 489 (defining the relevant market as hotel rooms,  not Holiday Inn hotel rooms, while stating that the market share inquiry "requires that the defendant dominate the relevant market"); *see also* 2B Phillip E. Areeda et al., Antitrust Law ¶ 531, at 245 (4th ed. 2014) ("[W]e still need market definition in order to see a particular firm's market share."). ACTGC conflates these two inquiries. To adopt ACTGC's approach of defining the product market as solely consisting of the products that the alleged monopolist controls would, as the district court put it, "swallow[]" "the rule of reasonable interchangeability and cross-elasticity of demand." Such an approach would make the separate market share inquiry pointless, as almost every firm has a monopoly on its own products. *See Spectrofuge Corp.*, 575 F.2d at 282.

In sum, ACTGC has not pleaded a legally sufficient product market under either of its proffered definitions. If the relevant product market is cemetery tours, it has not identified or included reasonably interchangeable substitutes. And if the product market is cemetery tours of Nos. 1 and 2, such a market is unduly narrow. ACTGC has thus not properly defined the relevant market as required to bring its claims under the Sherman Act, and the district court correctly dismissed these claims.

## V.

For the foregoing reasons, we GRANT the motion to dismiss the First Appeal as moot, DISMISS the First Appeal (No. 22-30091), and AFFIRM the judgment of the district court on all issues in the Second Appeal (No. 22-30559).